**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LILIA NAZAROV, DAHIANA GRULLON, SYLVANA MARMOLEJOS, and FRANCISCO MONTERO, all Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>RE/MAX HOLDINGS INC., RE/MAX, LLC, RMCO, LLC, RIHI, INC., ERIK CARLSON, ADAM CONTOS, STEPHEN P. JOYCE, KERI CALLAHAN, DAVID LINIGER, and GAIL LINIGER,<br><br>Defendants. | **Civil Action No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Lilia Nazarov, Dahiana Grullon, Sylvana Marmolejos, and Francisco Montero (together, "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, for their complaint against RE/MAX Holdings, Inc., RE/MAX, LLC, RMCO, LLC, and RIHI, Inc. (collectively, the "RE/MAX Syndicate"), Erik Carlson, Adam Contos, Stephen P. Joyce, Keri Callahan, David Liniger, and Gail Liniger (collectively, the "Officer and Director Defendants"), asserting claims for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968; the New Jersey Racketeering Influenced Racketeer Influenced and Corrupt Organizations Act (N.J. § 2C:41-2(c); the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.; common law fraud; negligence; unjust enrichment; declaratory and injunctive relief; and other related causes of action, arising from the conduct of Defendants' agents acting with actual or apparent authority.

Lead Plaintiffs seek relief on behalf of a putative class of United States consumers

consisting of those who, between January 1, 2021 and February 25, 2025 (the "Class Period"), were deceived into purchasing non-existent real estate developments in the Dominican Republic by RE/MAX real estate agents operating without any broker license, suffering damages as a result of Defendants' misconduct.

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts are based upon the investigation of Lead Plaintiffs, conducted by and through their counsel, including review and analysis of: (1) press releases, news articles and other public statements issued by or concerning the RE/MAX Syndicate Defendants; (2) reports and other documents filed publicly by the RE/MAX Syndicate Defendants with the U.S. Securities and Exchange Commission ("SEC"); (3) the Defendants' website; and (4) a certified and translated copy of claims filed on February 25, 2025 by the Specialized Prosecutor's Office Against Money Laundering and Terrorism Financing and La Romana Prosecutor's Office, together with the Directorate of Financial Investigation and Money Laundering (collectively, the "Dominican Authorities") filed with the Dominican Republic, Judicial Branch, Judicial Office of Permanent Attention Services of the Judicial District of La Romana (the "Dominican Republic Criminal Action"); and (5) other publicly available information.

Lead Plaintiffs' investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT[1]

1. This putative class action is brought on behalf of hundreds of United States citizens and residents who fell victim to what Dominican authorities have described as an "***enormous real estate scheme***," orchestrated by individuals whom Defendants falsely promoted and misrepresented as "***trusted***," duly licensed RE/MAX agents possessing "***deep local insights***", assuring consumers they could "***have confidence in any market with us***."

2. Pursuing avenues to United States consumers deliberately established and facilitated by Defendants and leveraging the RE/MAX brand, marketing infrastructure, and technology platforms provided by the RE/MAX Syndicate, the agents of the enterprise executed a coordinated scheme spanning over three years to sell fictitious properties associated with two sham real estate development projects in the Dominican Republic.

3. In fraudulently marketing both the properties and the purported agents involved in this enterprise, Defendants violated multiple consumer-protection statutes, including the New Jersey Real Estate Full Disclosure Act (N.J.S.A. 45:16.27, et seq.), the New Jersey Real Estate License Act (N.J.S.A. 45:13-3, et seq.) and the New Jersey Consumer Fraud Act (N.J.S.A. 56:8-1), as well as other state and federal laws designed to safeguard consumers from exactly this type of deceptive cross-border real estate scheme.

4. The RE/MAX Syndicate knowingly orchestrated, authorized, and enabled agents within its Dominican Republic enterprise to capitalize upon the enterprise's falsely cultivated

[1] Unless otherwise indicated, all italics and emphasis have been added.

image of trust and legitimacy, using the RE/MAX name and branding as instruments of deception. Acting with actual or apparent authority, these agents perpetrated a calculated, multi-year fraud targeting United States consumers, inducing them to invest in purported real estate developments that did not, in fact, exist, and profiting from the fraud.

5. Throughout the Class Period, Plaintiffs and the putative Class were defrauded of tens of millions of dollars as a direct result of Defendants' willful participation, authorization, continuation, and concealment of this fraudulent enterprise.

6. Despite having full knowledge of and the ability to halt the misconduct, the Defendants failed to take any meaningful action to stop the agents within their enterprise or to warn prospective buyers and putative Class members of the ongoing fraud. Nor did Defendants issue even a minimal disclaimer alerting consumers to the lack of oversight or legitimacy of so-called "RE/MAX agents" operating in the Dominican Republic.

7. Instead, Defendants knowingly permitted the scheme to continue and profited from it through franchise fees, commissions, and brand expansion. After several years, and with substantial harm already done, the fraudulent enterprise was ultimately exposed and brought to an end only after intervention by Dominican law enforcement authorities, which led to the arrest of the non-party Dominican sellers and the RE/MAX agents involved in the scheme.

8. On February 25, 2025, the Dominican Authorities filed a criminal complaint against a "***criminal network***" led by certain non-party Dominican franchisees of Defendants' acting as RE/MAX agents. The Dominican Authorities' investigation revealed that the RE/MAX agent, Rocio Del Alba Rodriguez De Moya ("De Moya"), obtained a RE/MAX franchise from the RE/MAX Syndicate and utilized it as a vehicle to deceive and defraud consumers in the United

States by marketing fictitious real estate transactions and misappropriating millions of dollars in proceeds.[2]

9. The findings of the Dominican Authorities are extensive, detailed, conclusive, and shocking. As stated in the official complaint, the Dominican Authorities concluded: "***the master Broker and representative of the company that was in charge of promoting the sale of said projects (RE/MAX ONE), with these fraudulent dealings, via high-tech means they … managed to subtract capital from the victims' assets, affecting years of work and savings in the country and in the U.S.***, causing in addition to economic damages, also moral damages of emotional and psychological disturbance, when they are faced with the reality of something that began as a dream and has turned into a nightmare, since they have discovered more than two years later there is no building on the land where the supposed housing projects would be built, they do not have title deeds to the land, there is ***no address for the construction company, rather an uncertain destination, they do not return their money, nor any real possibility of compliance of the contract, it is all a deception***."

10. The fraud that occurred during the Class Period was willfully enabled, aided and abetted, and promoted by the Defendants. For years, the RE/MAX Syndicate has aggressively marketed itself and continues to market itself to real estate consumers in the United States as "***the #1 Most Trusted Brand in Real Estate***," cultivating a reputation grounded on integrity and trust.

---

[2] The initiating document in the Dominican Action, translated into English, is annexed hereto as **Exhibit "A."** The named defendants in the Dominican Action include individuals Yves Alexandre Giroux, Loany Lismeiry Ortiz Nova, Marisol Nova Nolasco, and Rocio Alba Rodriguez de Moya. Also named are the front companies Novasco Real Estate, S.R.L., Rodeco Marketing Group, and the Dominican "RE/MAX One" franchise, which was acquired by De Moya from the RE/MAX Syndicate Defendants. Collectively these individuals and entities are referred to as the "Non-Party Dominican Sellers."

These representations extended to the agents in the Dominican Republic involved in the transactions at issue.

11. To execute and profit from their fraudulent enterprise, Defendants orchestrated and maintained an international network of what they describe in fine print and internally as "independent" real estate agents and franchisees, functioning as instrumentalities of a unified enterprise.

12. The RE/MAX Syndicate derived significant and recurring revenue from this scheme through contractual franchise fees, annual dues, franchise sales, and broker fees. These revenues were driven by the volume of agents, the number of transactions, and the cultivated appearance of trust and legitimacy projected by Defendants' global network.

13. To maximize profits and expand the reach of their fraudulent enterprise, the RE/MAX Syndicate exploited consumer trust and confidence in the ***"#1 Most Trusted Brand in Real Estate***" it had cultivated among United States customers to aggressively target United States buyers seeking to purchase properties abroad. In doing so, Defendants leveraged their United States based reputation for trust and integrity to export that credibility overseas and deceptively induce U.S. consumers into purchasing fictitious real estate in the Dominican Republic, a jurisdiction where no meaningful safeguards, licensing standards, or compliance mechanisms governed the operations of Defendants' agents. This deliberate expansion into an unregulated market allowed Defendants to profit from fraud conducted under the false imprimatur of a "trusted" global brand.

14. These circumstances created a "Perfect Storm" in which Defendants' scheme could thrive. While operating under and simultaneously profiting from the RE/MAX Syndicate, RE/MAX agents involved in the fraudulent scheme promoted fictitious properties and lured the

Lead Plaintiffs along with the proposed class members into purchasing non-existent real estate in the Dominican Republic, in a scheme specifically targeting United States consumers.

15. Plaintiffs and the proposed Class members were deceived into believing they were purchasing luxury condominium units through licensed RE/MAX agents operating in the Dominican Republic.

16. These purported properties were marketed through sham front companies falsely presented as legitimate RE/MAX affiliated developments, including the so called "Romana Victoriana Residences Project" and "Bavarian Victorian Project."

17. In truth, neither of these projects existed. They were fabricated instruments of fraud, facilitated by the RE/MAX Syndicate which lent an appearance of authenticity to the scheme and to exploit consumer trust and goodwill associated with the RE/MAX brand caused by material misrepresentation of Defendants that induced United States consumers to transfer millions of dollars abroad under false pretenses.

18. In reliance on Defendants' misrepresentations and omissions, Plaintiffs and the putative Class members in the United States wired millions of dollars from United States banks to accounts controlled by Defendants' agents and their affiliates, believing they were purchasing legitimate real estate. This reliance was induced by Defendants' false assurances that their so-called "independent" agents were trustworthy professionals operating under the integrity, oversight, and protection of the RE/MAX brand. Defendants knowingly permitted the use of their trademarks, platforms, and marketing materials to facilitate these cross-border wire transfers, thereby directly enabling and profiting from the enterprise and the fraudulent scheme.

19. In executing the scheme, Defendants knowingly promoted, endorsed, and profited from unlicensed agents operating within their enterprise in the Dominican Republic, targeting

United States consumers despite full awareness that such activities took place in an unregulated and unlicensed foreign market. Defendants created a platform to enable unlicensed real estate agents to target and profit from United States consumers. By doing so, Defendants willfully disregarded their legal obligations to ensure that individuals engaged in real estate transactions under their brand operating within this District were properly licensed and compliant with governing laws, thereby violating the New Jersey Real Estate License Act.

20. Furthermore, Defendants violated the New Jersey Real Estate Full Disclosure Act by promoting and advertising foreign real estate to New Jersey residents through their website and online marketing materials without first ensuring that the properties were duly registered with the New Jersey Department of Banking and Insurance. Defendants also failed to include the statutorily required disclaimer stating that such advertisements did not constitute an offer to sell property to New Jersey residents, thereby engaging in unlawful and deceptive advertising practices directed at consumers within this District.

21. The fraudulent scheme was executed with both the actual and imputed knowledge of the RE/MAX Syndicate. Upon information and belief, Defendants were repeatedly placed on notice of the ongoing misconduct yet willfully turned a blind eye to it in order to preserve their lucrative stream of franchise fees, commissions, and brand expansion—and to avoid reputational damage to their "trusted" global image.

22. Despite possessing full authority and capability to act, the RE/MAX Syndicate deliberately failed to investigate, issue public disclaimers, or warn consumers regarding the conduct of the offending franchisees and agents. Instead, Defendants knowingly permitted and still permit the fraudulent enterprise to continue operating under the banner of the ***"#1 Most Trusted Brand in Real Estate***," with respect to foreign unlicensed agents marketed to customers

domestically, thereby prioritizing profit and perception over integrity and protection of United States consumers.

23. Despite Plaintiffs and the putative class members being defrauded of millions of dollars through hundreds of fraudulent property transactions, and notwithstanding findings by Dominican authorities and online news publications reporting on Defendants' scheme,[3] Defendants have never publicly acknowledged the widespread real estate scheme perpetrated by RE/MAX agents. Instead, Defendants continued to profit from the deception and misconduct of those agents, allowing the scheme to persist in order to avoid brand damage.

24. To this day, Defendants continue to connect United States consumers with unlicensed individuals in the Dominican Republic, presenting them without distinction from their so-called "#1 trusted agents" in the United States.

25. Lead Plaintiffs and the other putative class members now bring this action to pursue redress, recover their losses and seek all appropriate relief.

26. Plaintiffs' allegations center around the allegation that Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., and analogous consumer protection statutes of other jurisdictions by unlawfully and deceptively promoting fabricated real estate projects and unvetted agents as legitimate, trustworthy representatives of the RE/MAX Syndicate. In reality, these agents were neither vetted nor licensed, and the purported developments sold to United States consumers under the RE/MAX enterprise were entirely fictitious.

27. This action also asserts claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) **,** 18 U.S.C. §§ 1961–1968, including Racketeering Conspiracy under

---

[3] *See*, for example the online publication Finance Americas, "Fugitive Real Estate Scammer From Dominican Republic Captured After Having Nose Done in Colombia" (**Exhibit "B"**), and "Head of new real estate case captured in Columbia" (**Exhibit "C"**).

18 U.S.C. § 1962(d), as well as under the New Jersey Racketeering Act, N.J.S.A. 2C:41-2(c), and New Jersey Racketeering Conspiracy, N.J.S.A. 2C:41-2(d). Defendants engaged in and facilitated numerous overt and predicate acts of fraud as part of a coordinated racketeering enterprise and conspiracy to defraud the Lead Plaintiffs and the putative Class of funds in connection with sham real estate transactions.

28. Plaintiffs also assert claims for common-law fraud arising from Defendants' deliberate misrepresentations and omissions regarding the integrity, qualifications, and oversight of their RE/MAX agents. Defendants knowingly portrayed their agents as trustworthy and reputable professionals operating under the protection and supervision of the RE/MAX brand, while simultaneously profiting from their misconduct and disavowing any responsibility or control over their actions. These fraudulent misrepresentations were material, were intended to, and did, induce reliance by Plaintiffs and the proposed Class, and were made in the course of conduct by agents and franchisees acting with Defendants' actual, apparent, and implied authority.

29. Finally, because material misrepresentations on Defendants' website remain publicly accessible, and because Defendants continue to connect members of the public seeking to purchase real estate with unlicensed agents in the Dominican Republic while misrepresenting those agents' qualifications, Plaintiffs seek declaratory and immediate injunctive relief as warranted under the New Jersey Consumer Fraud Act.

## II. JURISDICTION & VENUE

30. This Court has jurisdiction over the subject matter of this action pursuant to U.S.C. § 1965 and 28 U.S.C. §§ 1331 and 1337.

31. Venue is proper in the District of New Jersey (this "District") pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, Defendants: (1)

purposely availed themselves of this District by marketing to Lead Plaintiffs who reside in this District; (2) transacted business in the United States, including in this District; (3) had a substantial market in this District; and (4) maintained agents here.

32. Venue in this Court is further proper under Section 1965(b) of RICO because (1) the Court possesses personal jurisdiction over at least one member of the enterprise based on a traditional minimum contacts analysis with the forum state, (2) there is no other district in which a court would have personal jurisdiction over all of the alleged co-conspirators, and (3) the facts alleged herein show a single RICO conspiracy exists.

33. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the parties are minimally diverse, the proposed class exceeds 100 members, and the aggregate amount in controversy exceeds $5,000,000.

34. During the Class Period, Defendants have made misrepresentations relating to the sale of real property to residents and citizens of this District and throughout the United States. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

35. During the Class Period, Defendants also perpetrated their pattern of racketeering activity through their use of the United States mail and interstate and international wires and promotional activities and marketing in this District.

36. This Court has personal jurisdiction over each Defendant because, *inter alia*, and related to the transactions and occurrences here: (a) Defendants have purposefully availed themselves and transacted business throughout the United States, including this District; (b) Defendants participated in the sale of fraudulent "sham real estate" transactions throughout the United States, including in this District; (c) Defendants participated in the marketing of real estate

through its "***#1 Most Trusted Brand in Real Estate***" and not only specifically targeted but also participated in a fraud which affirmatively defrauded purchasers of real estate who reside in this District; (d) Defendants have made material misrepresentations relating to the trustworthiness and qualifications of their agents directly to residents within this District; and (e) Defendants had and have maintained substantial contacts with the United States, including in this District.

37. Moreover, it comes well within a reasonable exercise of the police power of the State to protect the public from fraud, misrepresentation, incompetence and sharp practice prohibiting brokers not licensed in New Jersey is an implementation of that policy and a federal court sitting in diversity has jurisdiction to address such claims.

38. Separately and independently, the ends of justice require the exercise of personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965(b), because, absent such jurisdiction, Plaintiffs' racketeering claims could not be adjudicated in a single action.

## III. <u>THE PARTIES</u>

### A. <u>Lead Plaintiffs</u>

39. Lead Plaintiffs Lilia Nazarov, Sylvana Marmolejos, Francisco Montero and Dahiana Grullon, are all residents of the United States and residents of the States of New Jersey and/or New York, respectively. Each Lead Plaintiff was solicited while in the United States and entered into the purported real estate transactions at issue from within the United States.

40. During the Class Period, each Lead Plaintiff wired funds from bank accounts within the United States to RE/MAX agents as consideration for purported real estate in the sham real estate projects known as the "Romana Victoriana Residences Project." As a direct result of the misconduct alleged herein, they have sustained substantial financial losses.

41. Lead Plaintiff Lilia Nazarov, a resident of the State of New Jersey, entered into a

contract brokered by individuals holding themselves out as RE/MAX agents to purchase real estate in reliance upon the Defendants' solicitations, marketing materials, and repeated representations that they were the ***"#1 Trusted Real Estate Brand***" and that the real estate agents and transactions involved had been vetted and endorsed by RE/MAX.

42. In reliance upon these and other material misrepresentations, Nazarov agreed to purchase a property in a development marketed as the *Romana Victoriana Residences,* purportedly located in the Province of La Romana, Dominican Republic. Acting upon the belief that she was engaging in a legitimate transaction sanctioned by the RE/MAX Syndicate, Ms. Nazarov wired funds in the amount of $27,771.00 from her bank account in New Jersey to individuals and entities she understood to be operating with the actual or apparent authority of Defendants. *See* **Exhibit "d."**

43. Lead Plaintiffs Sylvana Marmolejos and Francisco Montero, husband and wife and residents of the State of New Jersey, entered into a contract to purchase real estate in reliance upon the Defendants' solicitations, marketing materials, and repeated representations that they were the ***"#1 Trusted Real Estate Brand***" and that the real estate agents and transactions involved had been vetted and endorsed by the RE/MAX Syndicate. Relying on these and other material misrepresentations, Ms. Marmolejos and Mr. Montero agreed to purchase property in a development marketed as the Romana Victoriana Residences, purportedly located in the province of La Romana, Dominican Republic. In further reliance on the Defendants' conduct and representations, Ms. Marmolejos wired funds in the amount of $31,627.00 from her New Jersey bank account to individuals and entities she believed were acting with the actual or apparent authority of the Defendants. *See* **Exhibit "E"**.

44. Lead Plaintiff Dahiana Grullon, a resident of College Point, in the State of New

York, entered into a contract to purchase real estate in reliance upon the Defendants' solicitations, marketing materials, and repeated representations that they were the ***"#1 Trusted Real Estate Brand***" and that the real estate agents and transactions involved had been vetted and endorsed by RE/MAX. Relying on these and other material misrepresentations, Ms. Grullon agreed to purchase property in a development marketed as the *Romana Victoriana Residences*, purportedly located in the province of La Romana, Dominican Republic. In further reliance on the Defendants' conduct and representations, Ms. Grullon wired funds in the amount of $17,102.00 from her New York bank account to individuals and entities she believed were acting with the actual or apparent authority of the Defendants. *See* **Exhibit "F."**

**B. <u>RE/MAX Syndicate Defendants</u>**

45. Defendants operate as a global syndicate of franchisees that generates profit by leveraging their so-called "***#1 Most Trusted Brand in Real Estate***," an extensive social media presence, targeted advertising strategies, and proprietary technology and systems—all driven by the recruitment and expansion of agents and franchisees for profit.

46. The "trusted" RE/MAX enterprise is disseminated to franchisees and customers through a series of corporate mechanisms controlled and coordinated by the aforementioned RE/MAX Syndicate, which consists of: Defendants RE/MAX Holdings, Inc. ("RE/MAX Holdings"), RE/MAX, LLC, RMCO, LLC ("RMCO"), and RIHI, Inc. ("RIHI").

47. Upon information and belief, RE/MAX Syndicate has deliberately structured and diversified its various corporate entities to shield itself from the actions of its agents and franchisees and to disclaim any potential liability arising from their misconduct.

48. Simultaneously, this corporate structure was intentionally designed to allow the RE/MAX Syndicate executives to extract substantial profits by aggressively driving agent growth,

capitalizing on revenue streams tied to agent count and the perceived integrity of its trusted brand, and unscrupulously ***defrauding customers*** in the United States such as Lead Plaintiffs, while keeping costs low.

49. The following diagram, excerpted from the RE/MAX Syndicates' Form 10-K Annual Report purports to illustrate the Syndicate's corporate and operational structure as represented by the RE/MAX Syndicate itself:




50. Upon information and belief, Defendant RE/MAX Holdings is a Delaware corporation with its principal place of business located in Denver, Colorado. According to its publicly filed annual reports, RE/MAX Holdings serves as the majority owner and sole manager of RMCO.

51. Upon information and belief, Defendant RIHI, is a private company, incorporated in Delaware and with its principal place of business in Denver, Colorado that functions as a private holding company that is the controlling stockholder of and manages and controls the public RE/MAX Holdings, Inc.

52. Upon information and belief, Defendant RMCO, is a Delaware limited liability company with a principal place of business in Delaware, and is the parent company that owns and

manages RE/MAX, LLC.

53. Upon information and belief, Defendant RE/MAX, LLC is a wholly owned subsidiary of RMCO, LLC and an indirect subsidiary of RE/MAX Holdings. RE/MAX, LLC owns and controls the RE/MAX brand and is responsible for selling franchise and franchising rights, as well as providing marketing, branding, and technology services to its franchisees and agents worldwide. Its assets primarily consist of royalty-based revenue streams, accounts receivable from franchisees and agents, and digital infrastructure and technology platforms used to facilitate real estate transactions and generate profits across the RE/MAX network.

**C. RE/MAX Officer and Director Defendants**

54. On information and belief, Erik Carlson is a Director and is the current Chief Executive Officer of RE/MAX Holdings, Inc. where he has served since November 2023. During the Class Period, Carlson executed Annual Form 10-K filings with the U.S. Securities and Exchange Commission, affirmatively representing that "RE/MAX agents continue to be voted the most trusted choice. Home buyers and sellers have voted RE/MAX as the brand with the #1 most trusted agents in the U.S. and Canada year after year."

55. Upon information and belief, Carlson knew, and either affirmatively misrepresented or deliberately concealed, that the RE/MAX Syndicate was marketing, promoting, and connecting unlicensed agents in the Dominican Republic with U.S. consumers, while equipping those agents with the tools, branding, and technology to solicit investments under the guise of being "trusted" RE/MAX agents. Carlson further knew during the Class Period that the Dominican Republic lacked any meaningful licensing or regulatory standards for real estate professionals, yet Carlson permitted and endorsed the use of the RE/MAX name and platform in that market to create a false appearance of legitimacy and oversight.

56. On information and belief, Adam Contos was appointed to the Board of Directors of RE/MAX Holdings in December 2018. He is the former Chief Executive Officer of RE/MAX Holdings, Inc. from January 2022 through November 2023 when it subsequently entered into a three-year consulting agreement with Joyce to perform consulting services. During the Class Period, Contos executed Annual Form 10-K filings with the U.S. Securities and Exchange Commission, affirmatively representing that "RE/MAX agents continue to be voted the most trusted choice. Home buyers and sellers have voted RE/MAX as the brand with the #1 most trusted agents in the U.S. and Canada year after year."

57. Upon information and belief, Contos knew, and either affirmatively misrepresented or deliberately concealed, that the RE/MAX Syndicate was marketing, promoting, and connecting unlicensed agents in the Dominican Republic with U.S. consumers, while equipping those agents with the tools, branding, and technology to solicit investments under the guise of being "trusted" RE/MAX agents. Contos further knew during the Class Period that the Dominican Republic lacked any meaningful licensing or regulatory standards for real estate professionals, yet Contos permitted and endorsed the use of the RE/MAX name and platform in that market to create a false appearance of legitimacy and oversight.

58. On information and belief, Stephen P. Joyce was appointed to the Board of Directors of RE/MAX Holdings, Inc. in April 2020. He is the former Chief Executive Officer of RE/MAX Holdings, Inc. from January 2022 through November 2023 when it subsequently entered into a three-year consulting agreement with Joyce to perform consulting services. During the Class Period, Joyce executed Annual Form 10-K filings with the U.S. Securities and Exchange Commission, affirmatively representing that "RE/MAX agents continue to be voted the most trusted choice. Home buyers and sellers have voted RE/MAX as the brand with the #1 most trusted

agents in the U.S. and Canada year after year."

59. Upon information and belief, Joyce knew, and either affirmatively misrepresented or deliberately concealed, that the RE/MAX Syndicate was marketing, promoting, and connecting unlicensed agents in the Dominican Republic with U.S. consumers, while equipping those agents with the tools, branding, and technology to solicit investments under the guise of being "trusted" RE/MAX agents. Joyce further knew during the Class Period that the Dominican Republic lacked any meaningful licensing or regulatory standards for real estate professionals, yet Joyce permitted and endorsed the use of the RE/MAX name and platform in that market to create a false appearance of legitimacy and oversight.

60. On information and belief, Karri Callahan is the Chief Financial Officer of RE/MAX Holdings, Inc. Callahan oversees all finance, accounting, tax, treasury, investor relations, legal and risk management functions of RE/MAX holdings and its affiliated companies, including RE/MAX, LLC. During the Class Period, Callahan executed Annual Form 10-K filings with the U.S. Securities and Exchange Commission, affirmatively representing that "RE/MAX agents continue to be voted the most trusted choice. Home buyers and sellers have voted RE/MAX as the brand with the #1 most trusted agents in the U.S. and Canada year after year."

61. Upon information and belief, Callahan knew, and either affirmatively misrepresented or deliberately concealed, that the RE/MAX Syndicate was marketing, promoting, and connecting unlicensed agents in the Dominican Republic with U.S. consumers, while equipping those agents with the tools, branding, and technology to solicit investments under the guise of being "trusted" RE/MAX agents. Callahan further knew during the Class Period that the Dominican Republic lacked any meaningful licensing or regulatory standards for real estate professionals, yet Callahan permitted and endorsed the use of the RE/MAX name and platform in that market to create

a false appearance of legitimacy and oversight.

62. On information and belief, David Liniger co-founded RE/MAX Holdings and has been Chair of the Board of Directors of RE/MAX Holdings, Inc. since July 2013, and, before that, of RE/MAX, LLC or its parent companies, since it was established in August 1974. During the Class Period, David Lineger executed Annual Form 10-K filings with the U.S. Securities and Exchange Commission, affirmatively representing that "RE/MAX agents continue to be voted the most trusted choice. Home buyers and sellers have voted RE/MAX as the brand with the #1 most trusted agents in the U.S. and Canada year after year."

63. Upon information and belief, David Liniger knew, and either affirmatively misrepresented or deliberately concealed, that the RE/MAX Syndicate was marketing, promoting, and connecting unlicensed agents in the Dominican Republic with U.S. consumers, while equipping those agents with the tools, branding, and technology to solicit investments under the guise of being "trusted" RE/MAX agents. David Liniger further knew during the Class Period that the Dominican Republic lacked any meaningful licensing or regulatory standards for real estate professionals, yet David Liniger permitted and endorsed the use of the RE/MAX name and platform in that market to create a false appearance of legitimacy and oversight.

64. On information and belief, Gail Liniger co-founded RE/MAX Holdings, has been a director since July 2013, and was formerly a director of RE/MAX, LLC or its parent companies. During the Class Period, Gail Liniger executed Annual Form 10-K filings with the U.S. Securities and Exchange Commission, affirmatively representing that "RE/MAX agents continue to be voted the most trusted choice. Home buyers and sellers have voted RE/MAX as the brand with the #1 most trusted agents in the U.S. and Canada year after year."

65. Upon information and belief, Gail Liniger knew, and either affirmatively

misrepresented or deliberately concealed, that the RE/MAX Syndicate was marketing, promoting, and connecting unlicensed agents in the Dominican Republic with U.S. consumers, while equipping those agents with the tools, branding, and technology to solicit investments under the guise of being "trusted" RE/MAX agents. Gail Liniger further knew during the Class Period that the Dominican Republic lacked any meaningful licensing or regulatory standards for real estate professionals, yet Gail Liniger permitted and endorsed the use of the RE/MAX name and platform in that market to create a false appearance of legitimacy and oversight.

66. Upon information and belief, and based on information within the possession, custody, or control of Defendants, each of the Officer Defendants had actual or constructive knowledge of the fraudulent acts and omissions committed by the RE/MAX Syndicate, as described in detail herein.

## IV. OVERVIEW OF DEFENDANTS' FRAUD

### A. Introduction to the Global RE/MAX Syndicate[4]

67. Defendants operate a global real estate syndicate under what they characterize as a "franchised business model." The RE/MAX Syndicate operates in more than one-hundred and fifty (150) countries and territories and includes approximately 140,000 agents. Through this network, Defendants jointly and severally own, operate, control, and sell RE/MAX franchises and distribute the RE/MAX® brand, which is prominently marketed to U.S. consumers as the ***"#1 Most Trusted Brand in Real Estate***."

[4] Unless otherwise indicated, the factual allegations and background contained herein directly relates to the conduct that occurred during the Class Period.

68. The RE/MAX Syndicates' agents are interconnected through a centralized marketing platform and are actively promoted to U.S. consumers as part of RE/MAX's global network.

69. Through their ownership and control of the RE/MAX brand and platform, Defendants have generated substantial financial profits by selling franchise and regional franchising rights.

70. The financial success of the RE/MAX Syndicate is heavily dependent on the size of its agent network, with revenue primarily generated through recurring contractual fees, annual dues, and broker fees, which are calculated as a percentage of commissions from real estate transactions conducted by RE/MAX agents. Accordingly, Defendants reap substantial financial profits by actively promoting agents within their network, equipping franchisees and consumers with tools to facilitate transactions, and marketing RE/MAX agents globally as trustworthy and reputable professionals.

**B. <u>The RE/MAX Platform Connects Consumers of this District to RE/MAX Agents Globally, Including the Non-Party Dominican Sellers</u>**

71. Through the RE/MAX website (www.remax.com, the "RE/MAX Website"), consumers across the United States, including within this District, can register and search for properties,[5] browse property listings, and connect with RE/MAX agents promoted by the

[5] All references to the remax.com website are contemporaneous, and discovery will be required to determine the specific representations made on the website during the Class Period. Upon information and belief, the website includes a "Terms of Use" agreement accessible only through a discrete hyperlink buried in a corner of the site, and users who browse agent profiles or property listings are not required to acknowledge or affirmatively agree to those terms. Within that document, Defendants expressly state: "*The Site is designed to provide you access to residential and commercial real estate listings, real estate related information, and information about RE/MAX and its global real estate system of independently owned and operated affiliates and their network of independent sales professionals.*" *See* **Exhibit "G."**

RE/MAX Syndicate as qualified and knowledgeable agents (even when they are not actually registered real estate brokers, as most in the Dominican Republic are not).

72. In their marketing, Defendants actively encourage consumers in this District to engage in cross-border real estate transactions involving properties in foreign jurisdictions that are often geographically remote and difficult to access, all without requiring any level of due diligence that would reasonably be associated with high-value purchases.

73. Defendants connect consumers to RE/MAX agents and property listings through their online platform, enabling properties (regardless of their value or quality) to be marketed to American buyers under the trusted RE/MAX brand. RE/MAX assures consumers on its homepage that they can "***have confidence in any market with us***" due to its "***extensive global connections and deep local insights***," thereby reinforcing trust in the brand and its agents abroad.




74. The REMAX Website therefore enables consumers throughout the United States, including within this District to search, locate, and identify property listings, and connect with individuals whom the RE/MAX Syndicate holds out to be qualified and knowledgeable RE/MAX agents.

75. Through the RE/MAX Website, the RE/MAX Syndicate holds out these agents, including those operating in international markets such as the Dominican Republic, as part of its unified global network. The platform is publicly accessible online and actively marketed to United States consumers seeking to purchase real estate both domestically and abroad. The RE/MAX Syndicate's moniker is "***One World. One Search.***":







76. Following a property search on the RE/MAX Website, potential consumers in the United States are automatically connected with RE/MAX agents and property listings worldwide, all of which are promoted as "RE/MAX properties" under Defendants' unified global brand and integrated marketing strategy.

77. Through this centralized system, Defendants actively link United States consumers to international agents and developments—including those in the Dominican Republic—under the false pretense that all such agents and properties are legitimate, trustworthy, and as represented by the RE/MAX brand can be treated similarly just as those developments that are sold domestically.




78. In its "Homebuyers Guide," posted on the RE/MAX Website, the RE/MAX Syndicate makes the following representation to consumers regarding its agents: *"**RE/MAX agents average more sales and have more real estate sales experience than other real estate agents. What does that mean for you? It means when you work with a RE/MAX agent, you are getting a dedicated real estate professional with access to a vast knowledge base, as well as the tools and support they need to help you find and purchase the right home.**" See* **Exhibit "H."**

**C. <u>The RE/MAX Syndicates Representations of "Trustworthiness" of Their Global Agents Extend Beyond Its Website</u>**

79. RE/MAX Syndicate's marketing of itself as the *"#1 Most Trusted Brand in Real Estate*," including in connection with transactions involving unregulated and unlicensed agents in the Dominican Republic, extends far beyond statements made on its website. These representations permeate a wide range of media, including television commercials, social media campaigns, billboards, bus placards, digital display advertising, and search-engine marketing.

80. Over the years, RE/MAX has invested billions of dollars in promoting its brand and affiliated agents. According to RE/MAX's own consumer studies, "trust" has been identified as the single most important factor influencing a consumer's choice of real estate agent. As stated by Abby Lee, Executive Vice President of Marketing, Communications, and Events for RE/MAX

Holdings, "Consumers need to know that the real estate agent they choose to work with is the most trusted, most professional, most effective, and most valuable one around." *See* **Exhibit "I."** In making these representations, RE/MAX draws no distinction between its U.S.-licensed agents and those operating in the Dominican Republic who, upon information and belief, are unlicensed and unregulated.

81. Relying on these misrepresentations disseminated outside of the RE/MAX website, Lead Plaintiffs, and, upon information and belief, other putative Plaintiffs, wired funds to individuals represented to be "RE/MAX agents" and purchased what were later revealed to be fictitious properties in the Dominican Republic.

## D. <u>The RE/MAX Syndicate Drives Profit Primarily by Receiving Continuing Franchise Fees, Annual Dues, and Broker Fees from its Agents</u>

82. The majority of the RE/MAX Syndicate's revenue is recurring in nature, derived primarily from its global network of franchisees and agents. This revenue includes continuing franchise fees, annual dues, and broker fees, the latter of which are typically calculated as a percentage of the real estate commissions earned when a RE/MAX agent facilitates the purchase or sale of a property.

83. Each franchise, whether located in the United States or internationally, is contractually obligated to pay the RE/MAX Syndicate a fixed monthly franchise fee, regardless of transaction volume. These continuing franchise fees represent the Syndicate's most significant source of revenue.

84. In addition to franchise fees, each RE/MAX agent is required to pay an annual due for the right to operate under and promote the RE/MAX brand.

85. The RE/MAX Syndicate also participates in commission-based profit sharing, earning a percentage of the total commission generated from each transaction completed by a RE/MAX agent.

### E. <u>Faced With a Declining Domestic Agent Base, Defendants Expand Aggressively Overseas to Inflate Their "Trusted Brand," Drive Profits, and Attempt to Promote and Sustain Growth</u>

86. As previously noted, the RE/MAX Syndicate operates as a franchise system,[6] with brokerage offices branded under the RE/MAX name franchised directly within what it calls "Company-Owned" regions in the United States and Canada. However, during the Class Period and in recent years, an increasing share of RE/MAX's profits has been generated from its "Independent Regions" outside the U.S. and Canada. These Independent Regions function as regional franchise owners that "sub-franchise" specific rights, while continuing to actively use and promote the RE/MAX brand to drive commissions and sales.

The following depicts our franchise structure and the location of our Company-Owned versus Independent Regions:

| Tier | Description | Services |
|---|---|---|
| **Franchisor (RE/MAX, LLC)** | Owns the right to the RE/MAX brand and sells franchises and franchising rights. | • Brand<br>• Technology<br>• Marketing<br>• Educational resources & tools |
| **Independent Regional Franchise Owner** | Owns rights to sell brokerage franchises in a specified region.<br>*Typically, 20-year agreement with up to three renewal options.*<br>*RE/MAX, LLC franchises directly in Company-Owned Regions, in the rest of the U.S. and Canada.* | • Local Services<br>• Regional Advertising<br>• Franchise Sales<br>*In Company-Owned Regions in the U.S. and Canada, RE/MAX, LLC performs these services.* |
| **Franchisee (Broker-Owner)** | Operates a RE/MAX-branded brokerage office, lists properties and recruits agents.<br>*Typically, 5-year agreement.* | • Office Infrastructure<br>• Sales Tools / Management<br>• Development & Coaching<br>• Broker of Record |
| **Agent** | Branded independent contractors who operate out of local franchise brokerage offices. | • Represents real estate buyer or seller<br>• Typically sets own commission rate |

87. As the RE/MAX Syndicate recognizes, it derives significant benefit from its global market share and it often touts through its slogan that "***Nobody in the world sells more real estate***

[6] Defendants acknowledge operating under a "low-fixed cost structure." While maintaining approximately 500 to 550 employees in offices throughout the United States and Canada during the Class Period, Defendants did not station any employees in their so-called "Independent Regions" (including the Dominican Republic) globally.

***than RE/MAX***." To this end, the RE/MAX Syndicate has made representations in its annual report(s), that professes the brand is built on an "***agent-centric model that helps to attract, develop and retain the trusted, productive and professional agents***."

88. But, as acknowledged by Defendants, the RE/MAX Syndicate has faced a "***steady decline***"[7] in U.S.-based agents since at least 2017, prompting a strategic shift toward increasing agent count within its "Independent Regions" across international markets. Consequently, throughout the Class Period, Defendants have stated, "***We have grown steadily in regions outside the U.S. and Canada***."




89. For most of the Class Period, the number of RE/MAX agents operating in Independent Regions outside the United States and Canada surpassed the number of agents within those domestic markets. This strategic global expansion was part of the RE/MAX Syndicate's strategy to drive profits.

90. RE/MAX agents overseas and across the globe are encouraged to actively use the

---

[7] In its 2024 Annual Report, the RE/MAX Syndicate partially attributed its shift in agent growth strategy toward "Independent Regions" to changing market conditions, stating to shareholders: "In 2022, interest rates began to rise, causing a decline in the residential real estate market in the U.S. and Canada."

RE/MAX® trademark pursuant to franchise agreements entered into with the RE/MAX Defendants to generate real estate transactions. Defendants have recognized "***our business depends on strong brands…particularly in new markets where we have limited brand recognition***." To this end the RE/MAX® trademark has been in continuous use for over fifty (50) years. RE/MAX states that it "***believes consumers have come to recognize the RE/MAX brand as being synonymous with high-quality real estate service***."

91. The RE/MAX brand was and is therefore being purposefully deployed to United States consumers, including those within this District, as "***the #1 Most Trusted Brand in Real Estate***," directing United States consumers to a global network of agents, including in unregulated real estate markets such as the Dominican Republic, while at the same time Defendants expressly disclaimed any oversight or control over those foreign agents or their activities.

92. Upon information and belief, based upon SEC filings the RE/MAX Syndicate generated at least fifty (50) million United States dollars from its global operations between 2021 and 2024.

93. However, as acknowledged by RE/MAX Chief Financial Officer Karri Callahan, the RE/MAX Syndicate's principal value proposition outside the United States and Canada beyond its profits is its brand. *See* **Exhibit "J."**

94. The RE/MAX Syndicate's brand expansion is pursued aggressively despite the absence of consistent oversight or regulation. The RE/MAX Syndicate prioritizes the growth of its real estate infrastructure and global transaction volume to drive brand expansion and profits across all markets, treating marketing in those foreign markets identically to that directed at United States consumers, notwithstanding the inherent risks involved.

95. The designation of RE/MAX as the *"#1 Most Trusted Brand in Real Estate"* is

derived from the BrandSpark® American Trust Study for the years 2019 and 2022–2024, which upon information and belief, evaluates consumer trust specifically within the context of United States real estate transactions.

96. Nevertheless, in marketing agents and properties to U.S. consumers under this designation, the RE/MAX Syndicate intentionally blurs any distinction between its United States based agents and those operating abroad in its so-called "Independent Regions." In doing so, Defendants make no distinction as to and therefore misrepresent fundamental regulatory differences in licensing, qualifications, and oversight, falsely conveying to consumers that foreign agents and properties are governed by the same regulatory framework, professional standards, and consumer protection safeguards that apply to RE/MAX agents operating domestically within this District.

### F. Defendants Encourage "Independent Regions" to Recruit Agents and Utilize an Integrated Digital Platform Designed to Drive Lead Generation and Position Affiliates as "Local Experts"

97. In 2019, RE/MAX, LLC announced the launch of its "booj platform", which it touted as an "integrated suite of digital products that will empower high-producing agents, teams and brokers to establish, manage, and grow client relationships" and "***these sites are designed to position RE/MAX affiliates as local experts***."[8] *See* **Exhibit "K."**

98. Upon information and belief, during the Class Period Defendants provided access to the "booj" platform, or a similar digital platform, to the Non-Party Dominican Sellers to

---

[8] Former RE/MAX CEO Adam Contos touted the booj platform as "a milestone moment for our brand. ***RE/MAX agents consistently outsell other agents by more than 2-to-1 at large brokerages, and the booj Platform will only strengthen their competitive advantage.*** When homebuyers and sellers decide to work with a RE/MAX agent, they can rest assured their agent comes equipped with the efficient and smooth homebuying or selling experience." *See* **Exhibit "K"**

facilitate the fraud perpetrated against the Lead Plaintiffs and putative class members.[9]

99. According to Defendants, the "booj platform" was designed to enable their agents to achieve "***Lead Capture***" by promoting them to "***be more strategic in their interactions with potential clients, reaching out with relevant, targeted communications…based on an integrated set of tools that focus on consumer engagement and enablement. Home Valuation Pages, Individual Property Websites and Market Snapshots enable RE/MAX to drive engagement with consumers.***" *See* **Exhibit "K."**

100. The booj platform drives "***Client Engagement***" by "help[ing] agents stay on top of mind [with customers]" by providing the agent tools including the "Sphere Interaction Tool" which enables RE/MAX agents to "***see the latest communications with a customer and gives a visual indicator as to whether or not the agent needs to reconnect with them or not. Automation features within the platform can trigger email campaigns and other automated content based on consumer's actions on the site. Text, email, phone calls and marketing activity is driven back into the customer's engagement.***" *See* **Exhibit "K."**

101. Upon information and belief, the booj platform serves as a vehicle enabling unlicensed RE/MAX agents located in the Dominican Republic to directly solicit and target consumers within this District

**G. Strong Public Policy of the State of New Jersey Prohibits Any Act Aiding or Abetting Transactions Involving Unlicensed Real Estate Brokers**

102. The State of New Jersey imposes strict legal requirements on who may sell property to New Jersey residents, regardless of whether the property is located abroad.

103. A public policy has been definitively established in the State of New Jersey to

[9] Lead Plaintiffs will seek further discovery on these issues.

exclude a (unlicensed) layman from soliciting and engaging, directly, or indirectly in the sale of real estate pursuant to the New Jersey Real Estate License Act, N.J.S.A. 45:15-3 et seq. (the "Real Estate License Act").

104. The primary objective of the Real Estate License Act is to protect consumers by excluding undesirable, unscrupulous, and dishonest persons from the real estate business. The broker's licensing act [N.J.S.A. 45:15-1 et seq.] is a regulatory measure and represents strong public policy of the State of New Jersey.

105. Whenever a significant part or material "incident" of a transaction involving an unlicensed broker takes place in New Jersey, the Real Estate License Act applies.

106. Under the Real Estate License Act no person may engage in real estate brokerage activities in the State of New Jersey for compensation without first obtaining a valid real estate license.[10]

107. The Real Estate License Act contains no exemption for foreign real estate agents or foreign property transactions and New Jersey courts strictly enforce these licensing requirements to protect consumers from unlicensed real estate activities. It is therefore unlawful for a foreign real estate agent to sell foreign real property online within New Jersey without obtaining a real estate license.

108. Persons other than licensed brokers or salesman may not engage, directly or indirectly, in business of a real estate broker. The entire tenor and thrust of the Real Estate License

---

[10] A real estate broker, under the Real Estate License Act is defined to be "a person firm, or corporation, for a fee, commission or other valuable consideration, … lists for sale, lists for sale, sells, exchanges, buys or rents, or **offers or attempts to negotiate** a sale, exchange, purchase or rental of real estate … or solicits for prospective purchasers or assists or directs in the procuring of prospects or the negotiation or closing of any transaction … or negotiates, or offers or attempts or agrees to negotiate a loan secured … by mortgage … for others …" (emphasis supplied). *See* N.J.S.A. 45:15-3.

Act is that an unlicensed person may not act as a real estate broker or salesman in New Jersey.

109. Furthermore, it is an unlawful practice under the Real Estate License Act for any person to engage in, directly or indirectly, "paying any rebate, ***profit, or compensation*** or commission to anyone not possessed of a real estate license." (emphasis supplied) N.J.S.A. 45:15-17(k).

**H. There are Similar Consumer Protection Laws that Prevent the Unlicensed Practice of Real Estate in Every Jurisdiction**

110. Real estate fraud involving unlicensed brokers is prosecuted under both state and federal laws. Real estate transactions routinely involve interstate wire communications through emails, phone calls, electronic document transmissions, and wire transfers.

111. Nearly every jurisdiction enforces criminal and civil statutes designed to protect consumers from unlicensed brokerage activity. For example, New York Real Property Law § 442-d bars recovery of commissions by unlicensed brokers; Colorado law prohibits payment of commissions to unlicensed persons (C.R.S.A. § 12-10-217); Rhode Island forbids any sharing of commissions with unlicensed individuals (Gen. Laws § 5-20.5-14); Alabama authorizes cease-and-desist orders against unlicensed real-estate activity (Ala. Admin. Code r. 790-X-1-.03); Illinois imposes civil penalties up to $25,000 (225 ILCS 454/20-10); Maine classifies unlicensed brokerage as a Class E crime and imposes fines of $1,000 to $5,000 per violation; and Florida treats unlicensed brokerage as a third-degree felony (F.S.A. § 475.42).

112. Courts nationwide consistently hold that agreements with unlicensed real-estate brokers are illegal, void, and unenforceable as against public policy.

**I. It is Unlawful to Market Foreign Land to New Jersey Residents Without an Appropriate Disclaimer**

113. The Real Estate Full Disclosure Act, N.J.S.A. 45:15-16.27, et. seq. (the "Full

Disclosure Act"), is a consumer protection law in New Jersey that regulates the offering, sale, or marketing of out-of-state or foreign real estate to New Jersey residents. The Full Disclosure Act applies whenever property outside of New Jersey is advertised, promoted, or sold to New Jersey residents, regardless of the property's physical location.

114. Under the Full Disclosure Act, before any out-of-state or foreign property may be advertised or offered to New Jersey residents, the developer or seller must register the project with the New Jersey Real Estate Commission.

115. Moreover, when such properties are not registered—and are also not exempt from the Act—any advertisement distributed in or broadcast into New Jersey must include a clear disclaimer and that the advertisement does not constitute an offer to New Jersey residents.[11] N.J.A.C. 11:5-19.14 ("Advertising and sales promotions with respect to the sale and marketing of registered properties).

### J. <u>The RE/MAX Syndicates Aids, Abets, and Actively Facilitates the Fraudulent Marketing of its Dominican Republic Agents by Facilitating the Connection of Unlicensed Actors to United States Consumers Under the False Guise of Trustworthiness, Repute, Legitimacy and Brand Affiliation —Without Any Meaningful Disclaimer or Consumer Protection</u>

116. Real estate transactions in the Dominican Republic differ significantly from those in the United States. Unlike the United States system where offers, acceptances, and contract contingencies are formalized in writing and subject to attorney review in the United States, the Dominican market lacks any comparable procedural or statutory framework. *See* **Exhibit "L"**,

---

[11] "When properties or interests therein are not registered with the Commission, nor wholly or partially exempt from the Act, and advertisements regarding such properties or interests are placed in any media which is distributed in or broadcast into the State of New Jersey, ***a disclaimer shall be included, indicating that the properties or interests are not registered with the New Jersey Real Estate Commission, and that the advertisement is not an offer to New Jersey residents***." N.J.A.C. 11:5-19.14, Advertising and sales promotions with respect to the sale and marketing of registered properties.

"Why You Need the Right Real Estate Agent in the Dominican Republic." ("real estate agents in the "Dominican Republic do not need to be licensed or follow strict regulatory guidelines. There is no licensing system or law for agents, brokers, or agencies, which means anyone can present themselves as a realtor.")

117. There are no enforceable requirements in the Dominican Republic relating to the existence of clear and marketable title, verified construction milestones, or escrow protections.

118. In effect, purchasers of property in the Dominican Republic, many of whom are United States nationals, are left entirely exposed transacting in an unregulated market where funds may be demanded upfront without any guarantee of title, delivery, or legal recourse.

119. Accordingly, for United States based consumers engaging in foreign real estate transactions, the ability to identify reputable and trustworthy agents is of paramount importance. Recognizing the inherent risks of purchasing property abroad or through online platforms, United States consumers naturally gravitate toward established and recognizable brands such as RE/MAX an entity that aggressively markets itself to United States consumers as "the #1 Trusted Brand in Real Estate."

120. The lure of the RE/MAX brand and reputation, along with the rise of agents working overseas, the ease of access of the RE/MAX website, and the existence and attractiveness of properties abroad, all coalesced to create an ideal ecosystem for drawing in, and eventually preying upon, unwitting United States consumers.

121. In spite of the vulnerable United States consumer market, Defendants intentionally promoted and facilitated cross-border real estate transactions through their platforms and enterprise, inducing United States consumers to invest in overseas properties under false assurances that the agents within their enterprise were to be trusted.

122. During the Class Period, Plaintiffs, who are all United States based consumers, reasonably relied on representations made by the RE/MAX Syndicate. These included assurances that agents operating within the RE/MAX enterprise were "***the #1 Most Trusted Brand in Real Estate***" and that its agents were "***dedicated real estate professionals with access to a vast knowledge base***."

123. While making these representations, at no time did the RE/MAX Syndicate disclose through its platform that real estate transactions involving its agents in the Dominican Republic were under a completely different, unregulated framework outside the protections of United Staes law.

124. Defendants' deliberate failure to disclose or disclaim the true status of individuals held out as "RE/MAX agents" operating in the Dominican Republic constituted a pattern of material misrepresentations and omissions that deceived Plaintiffs and similarly situated consumers, inducing them to enter into the fraudulent transactions at issue. This conduct violated the New Jersey Consumer Fraud Act, the New Jersey Real Estate Full Disclosure Act, the New Jersey Real Estate License Act, and comparable consumer-protection statutes of other jurisdictions represented within the putative Class. Defendants' unlawful acts included, but were not limited to, the following:

(a) **<u>False Representations of Licensure and Trust</u>**. Misleading U.S. consumers by representing or concealing that RE/MAX agents operating in the Dominican Republic possessed the same professional licensure, regulatory oversight, and accountability as RE/MAX agents in the United States, despite knowing that such individuals were unlicensed and operated in an unregulated jurisdiction, in violation of the Real Estate License Act;

(b) **Facilitating, Aiding and Abetting Connections with Unlicensed Sellers for Profit**. Enabling United States consumers to connect through the RE/MAX website with purported agents in the Dominican Republic, including unlicensed sellers, and facilitating those communications despite knowledge that such actors were unregulated and unlicensed, for the purpose of obtaining profits or commissions, in violation of the Real Estate License Act;

(c) **Failure to Warn of Potential Unlicensed Agents**. Omitting any clear or conspicuous disclaimer or consumer notice informing United States or New Jersey consumers that RE/MAX-affiliated agents in the Dominican Republic were not required to be, and in many cases were not, licensed real-estate brokers;

(d) **Concealing Lack of Property Registration**. Failing to disclose that Dominican Republic properties advertised through RE/MAX platforms were not registered with, or approved by, the New Jersey Real Estate Commission as required under the Real Estate Full Disclosure Act (N.J.S.A. 45:15-16.27 *et seq.*), and did not constitute lawful offers to New Jersey residents;

(e) **Omitting Material Differences in Foreign Real-Estate Transactions**. Failing to disclose that real-estate transactions in the Dominican Republic differ materially from those conducted in the United States in terms of form, regulation, and consumer protection;

(f) **Misrepresenting Supervision and Authority**. Misleading U.S. consumers to believe that Dominican RE/MAX affiliates operated under the same training, supervision, and compliance standards imposed on United States RE/MAX

franchisees, while concealing that RE/MAX's "Independent Region" model permits foreign affiliates to operate autonomously and without equivalent regulatory oversight; and

(g) **Deceptive Portrayal of Unlicensed Sellers**. Repeatedly portraying the Non-Party Dominican Seller agents as "trusted" and telling consumers to trust their insights into local markets to induce consumer reliance, despite knowing that neither the sellers nor the purported properties were registered, reported, or subject to review by the New Jersey Real Estate Commission or any comparable regulatory authority;

(h) **Promotion of Fictitious Developments.** Through the RE/MAX Enterprise, making fraudulent communications and promotional materials to induce Plaintiffs and Class Members to invest in nonexistent developments, including the "Romana Victoriana Residences" and "Bávaro Victoriana Residences," marketed through Novasco Real Estate S.R.L. and related entities; and

(i) **Use of the Mail, Banking Channels, and Wires:** Through the RE/MAX Enterprise, utilizing interstate and international mail, banking systems, websites, and other electronic communications to promote, execute, and conceal the scheme of racketeering, and to induce Lead Plaintiffs and putative Class Members to transfer funds, as fully detailed herein.

125. In furtherance of this conspiracy, the Defendants and their co-conspirators, through the RE/MAX Enterprise among other things:

(a) Coordinated the use of RE/MAX's corporate resources, marketing platforms, and digital systems to promote fraudulent listings and fictitious developments;

(b) Enabled and encouraged the continued use of RE/MAX's trademarks, websites, and communication channels by unlicensed foreign sellers and shell entities to reach and defraud U.S. consumers;

(c) Disseminated false and misleading information through electronic communications, including emails, websites, and social media advertising;

(d) Concealed material facts regarding the absence of licensing, registration, and regulatory oversight applicable to the Dominican Republic agents and properties; and

(e) Shared profits and proceeds derived from the fraudulent transactions, thereby reinforcing and perpetuating the scheme.

126. The foregoing material misrepresentations and omissions were made notwithstanding that the Defendants had long been aware that their global operations were subject to disparate and inconsistent regulatory regimes. In fact, as reflected in the RE/MAX Syndicates annual reports made prior to the Class Period, Defendants expressly acknowledged that ***"regulatory constraints and costs of executing our growth strategy may vary by geography." See*** **Exhibit "M"** at p. 28.

127. Despite this express recognition, Defendants failed to disclose to United States consumers that such regulatory disparities materially affected the licensing, oversight, and accountability of RE/MAX-affiliated agents operating in the Dominican Republic, thereby perpetuating a deceptive and misleading uniform brand image to induce United States customers to enter cross-border transactions with its affiliated global agents.

128. On April 16, 2024, during the Class Period and while fraudulent misrepresentations were ongoing, New York Attorney General Letitia James and Congressman Adriano Espaillat

issued a consumer alert warning the public about real estate scams targeting the Dominican community.[12]

129. It is believed that, particularly in light of the heightened regulatory scrutiny surrounding real-estate activity in the Dominican Republic during the Class Period—the RE/MAX Syndicate, together with the Officer and Director Defendants, possessed full and actual knowledge that real-estate transactions in the Dominican Republic were being conducted by unlicensed individuals and without the oversight of any reputable or lawfully recognized brokerage authority. Despite this knowledge, Defendants deliberately continued to market, promote, and endorse Dominican Republic-based RE/MAX agents as reputable, trustworthy, and professionally accountable. In doing so, Defendants knowingly made and perpetuated the material misrepresentations and omissions set forth above, in direct violation of New Jersey law, thereby causing substantial injury to New Jersey residents, including the Lead Plaintiffs.

130. Despite full knowledge of the ongoing fraud, the RE/MAX Syndicate knowingly and willfully continued to make and disseminate these material misrepresentations with the intent to generate and retain fees, commissions, and millions of dollars in profits derived from its global operations (including those involving unlicensed agents in the Dominican Republic) and to preserve the outward appearance and perceived integrity of the RE/MAX brand. Rather than confront and correct the misconduct, Defendants chose to conceal it, prioritizing brand image,

[12] The alert followed criminal charges filed in the Dominican Republic against businessman Rivera Ledesma, who was accused of defrauding approximately 150 individuals in both the Dominican Republic and the United States, including roughly 24 New York residents. Prosecutors alleged that Ledesma ran a scheme in which he marketed fraudulent real estate investments in Santo Domingo, targeting primarily Dominican-Americans, and collected millions of dollars in deposits for properties he either had no legal authority to build or that were sold to multiple buyers simultaneously. *See* **Exhibit "N."**

revenue, and market expansion over regulatory compliance and consumer protection.

### K. The RE/MAX Syndicate Both Facilitated and Enabled the Fraud and the Dominican Sellers Perpetrated Their Scheme with the Knowledge and Implied Authorization of the RE/MAX Syndicate [13]

131. According to findings issued by Dominican Authorities, The RE/MAX agent who perpetrated the fraud against United States based consumers, including Lead Plaintiffs, were the Non-Party Dominican Sellers including Rocio del Alba Rodriguez De Moya ("De Moya"). De Moya was identified as "***the owner of a "RE/MAX ONE R.D. agency***"[14] and who "***by holding the franchise rights of a prestigious company such as RE/MAX, which convinced the victims (of the legitimacy of the real estate that was purchased.***" *See* **Exhibit "A."** In other words, De Moya's ability to defraud United States consumers, including Lead Plaintiffs, was directly facilitated by the authority, franchise status, and brand credibility conferred on her by the RE/MAX Syndicate.

132. After acquiring "franchise" rights, De Moya used the RE/MAX ONE franchise and brand to promote two fictitious real-estate developments the "Romana Victoriana Residences" and the "Bávaro Victoriana Residences." Both of these fictitious developments were specifically marketed to United States consumers. In reality, neither of these real-estate developments existed.

133. De Moya was emboldened and enabled by the RE/MAX Syndicate to exploit the RE/MAX name, trademarks, and franchise infrastructure, thereby lending her fabricated developments an air of authenticity, credibility, and legitimacy. In acting as part of the enterprise,

---

[13] Unless otherwise indicated, the information in this section is derived from findings made by the Dominican Authorities during the course of their investigation.

[14] The "RE/MAX ONE R.D." franchise responsible for the fraud was operating from the same address as the Non-Party Seller promotional entity, Rodeca Marketing Group, located at Abraham Lincoln Street No. 627, Plaza Castilla, Unit 5-B, Santo Domingo, National District.

the Dominican Non-Party Sellers led by De Moya were able to solicit substantial deposits and payments from U.S. purchasers who were falsely led to believe they were investing in genuine, RE/MAX–endorsed real estate projects backed by the integrity and oversight of the RE/MAX organization.[15]

134. The Romana Victoriana Residences development was promoted by RE/MAX agents as a transformative development in the Province of La Romana, purportedly located fifteen (15) minutes from the airport, thirteen (13) minutes from the beach, and ten (10) minutes from major shopping centers.




[15] The fraudulent promotions were conducted under the RE/MAX name and brand through a network of sham entities, including Novasco Real Estate S.R.L. ("Novasco"), which was incorporated on or about May 7, 2021, for the express purpose of acquiring a RE/MAX franchise and facilitating the fraudulent scheme. Novasco was operated by a husband-and-wife team and maintained no legitimate office, staff, or business infrastructure, upon information and belief existing as a vehicle to project an appearance of legitimacy through its affiliation with RE/MAX. *See* **Exhibit "A."** With respect to both purported developments —the "Romana Victoriana Residences" and the "Bávaro Victoriana Residences"—the Dominican Sellers never possessed legal title to, or any lawful right to sell, substantial portions of the properties advertised to United States consumers**.**

135. The second development promoted by RE/MAX agents was the "Bávaro Victoriana Residences" marketed as "Victoriana Solares — build your dream home!" The project was described as a transformative addition to the tourism sector in the Altagracia Province, characterized as being "full of class and elegance," and promoted for its "attractive amenities and family atmosphere."




136. According to findings of the Dominican Authorities, both fictious projects were promoted by RE/MAX affiliated agents who leveraged "***the multinational RE/MAX to easily attract clients through a manipulative framework.***"

137. Upon information and belief, the RE/MAX Syndicate equipped the Non-Party Dominican Sellers with access to the *booj* platform—or comparable RE/MAX-integrated technology—thereby enabling and accelerating cross-border connections between those unlicensed sellers and U.S. consumers. Defendants further amplified this outreach through coordinated digital marketing campaigns across social media platforms, including Instagram, as well as through WhatsApp, email, and other electronic communication channels directed at the Lead Plaintiffs and members of the putative Class throughout the Class Period. *See* **Exhibit "A."**

138. On February 8, 2023, United States Consumers, including upon information and belief Lead Plaintiffs, were invited to the Dominican Republic to the event called "First Groundbreaking and Ribbon Cutting Ceremony" for the purported Romana Victoriana Project. Upon information and belief, additional putative class members likewise attended this event, which was presented as an official RE/MAX–affiliated ceremony intended to reinforce the legitimacy and progress of the fictitious development and further induce consumer reliance.

139. At this event Del Moya was present, "as well as dozens of sales agents" and "***the victims were able to see that there were mechanical shovels and other machinery for preparing the land and creating the appearance of a real project, which was all a setup***."

(ATU)

Organized Crime

Operation Guepardo

Lic. Juan A. Fernández Pérez
Interprete Judicial
Santiago, R. D.



Plot of land at the project inauguration.

140. "When it was time to deliver the projects [agents of the RE/MAX Syndicate] began to disappear, not answering calls or emails, and not placing a block or cements on the plots where they were supposed to operate." *See* **Exhibit "A."**

141. The investigation conducted by the Dominican authorities determined that the

Dominican Non-Party Sellers never obtained the legally required permits or acquired ownership of the land necessary for the development of either the Romana Victoriana Residences or the Bávaro Victoriana Residences. Notwithstanding these fundamental deficiencies, both fictitious projects were aggressively marketed and sold throughout the Class Period by agents operating under and affiliated with the RE/MAX Syndicate, thereby lending the appearance of legitimacy and trustworthiness to what was, in reality, a fraudulent and nonexistent enterprise.

142. Upon information and belief, and as will be established through discovery, the RE/MAX Syndicate possessed actual and constructive knowledge that the Dominican Non-Party Sellers were promoting the so-called *"Romana Victoriana Residences"* and *"Bávaro Victoriana Residences"* through materially false and misleading representations. Despite this knowledge, the RE/MAX Syndicate willfully permitted the continued marketing and sale of these fictitious properties to the Lead Plaintiffs and putative class members throughout the Class Period.

**L. <u>Lead Plaintiff Lilia Nazarov's Allegations</u>**

143. In or about May 2022, while conducting an online search for properties in or around La Romana, Lead Plaintiff Lilia Nazarov was directed to the RE/MAX Website, which routed her inquiry to an individual in the Dominican Republic identifying himself as *"Kirby,"* a purported RE/MAX agent. After a brief exchange, Kirby referred Plaintiff to another individual who likewise represented himself as a RE/MAX-affiliated agent, thereby continuing the appearance that Plaintiff was dealing with authorized representatives of the RE/MAX Syndicate.

144. Beginning on or about May 24, 2022, and continuing over the course of the next two years, Plaintiff Nazarov engaged in extensive communications with an individual identifying himself as "Manuel Marcano," who held himself out as a Realtor with "RE/MAX Luxury." *See* **Exhibit "O."**

145. In reasonable reliance on Marcano's representations and on the RE/MAX Syndicate's material advertising misrepresentations and omissions, Plaintiff Nazarov wired substantial funds from her United States bank account toward the prospective purchase of real property in the Dominican Republic, believing she was transacting through a legitimate and licensed RE/MAX agent operating under the authority and oversight of the RE/MAX Syndicate.

146. To induce Nazarov to purchase property, Marcano sent Nazarov a promotional brochure he referred to as the "Victorian Roman," describing it as *"a project one hour from Punta Cana with an excellent tourist location and more than 30 amenities, and for this month of offers, furnished apartments from 43,300k."* **Exhibit "O."**

147. Marcano further represented that the condominiums were located approximately nine (9) minutes from the beach. Plaintiff Nazarov relied upon these representations, believing they originated from and were endorsed by a legitimate, high-value real estate investment offered through the RE/MAX Syndicate.

148. Marcano described the project as new construction with the following delivery timelines: Stage 1—August 2023; Stage 2—March 2024; Stage 3—August 2024; Stage 4—March 2025.

149. Marcano subsequently e-mailed to Nazarov documents purporting to list "all of the amenities that the project has nearby" and "photos of the 3-bedroom apartments." **Exhibit "O."**

150. Marcano communicated with Nazarov using an email address that incorporated the RE/MAX name: manuel@remaxlp.com. **Exhibit "O."**

151. Marcano also promoted a special "Mother's Day" offer under which apartments in the first and second phases would come furnished with appliances.

152. Plaintiff Nazarov expressed interest in stage two of the purported development,

specifically in a three-bedroom, two-bathroom unit.

153. Marcano informed Nazarov that, for new construction, a forty (40%) percent down payment was required, totaling $32,400.00, payable over a twenty-one (21) month period.

154. Marcano stated that he worked with an English-speaking "team," which Nazarov was led to believe was affiliated with the RE/MAX Syndicate.

155. Individuals whom Nazarov understood to be associated with the RE/MAX Syndicate sent her a document titled *"Promise of Purchase Agreement"* for the sale of a three-bedroom, two-bathroom apartment in the Romana Victoriana Residences project, reflecting an agreed purchase price of $81,000.

156. A certified English translation of the August 1, 2022 Spanish-language contract between the builder/developer—Novasco Real Estate, S.R.L., a Dominican shell company that the RE/MAX agent brokered the deal through and falsely promoted as legitimate—is attached as **Exhibit "P."**

157. Pursuant to the contract, Nazarov was obligated to pay a total purchase price of $81,000 in nineteen (19) installments. Based upon the material misrepresentations regarding the Victorian Roman project, Plaintiff Nazarov was induced to wire $27,771.00 to entities she believed to be a part of the RE/MAX Syndicate, consisting of the payments set forth in the chart below:[16]

[16] True and correct copies of the wire transfer receipts are annexed hereto as **Exhibit "D."**

| NUMBER | DATE | AMOUNT RECEIVED | DESCRIPTION | RATE US$ |
|---|---|---|---|---|
| 1 | January 1st, 2022 | US$493.00 | Partial payment reservation | N/A |
| 2 | July 13th, 2022 | US$7,668.00 | Full payment reservation + full payment 10% + partial payment 1C | N/A |
| 3 | August 30th, 2022 | US$3,293.00 | Full payment 1C + partial payment 2C | N/A |
| 4 | October 27th, 2022 | US$2,293.00 | Full payment 2C + payment 3C + partial payment 4C | N/A |
| 5 | December 28th, 2022 | US$3,293.00 | Full payment 4C + payment 5C + partial payment 6C | N/A |
| 6 | March 10th, 2022 | US$3,293.00 | Full payment 6C + partial payment 7C | N/A |
| 7 | June 5th, 2023 | US$3,293.00 | Full payment 7C + payment 8C + partial payment 9C | N/A |
| 8 | September 7th, 2023 | US$3,445.00 | Full payment 9C + payment 10C + partial payment 11C | N/A |
| | **AMOUNT PAID** | US$27,771.00 | | |
| | **RESERVATION** | US$500.00 | | |
| | **LEGAL FEES** | US$75.00 | | |
| | **WITHHOLDING 20%** | US$5,439.20 | | |
| | **TOTAL AMOUNT TO PAY** | US$21,756.80 | | |

**Made by: Roberto Suero**
**Date: February 7th, 2024**

158. On September 20, 2022, Nazarov followed up with Marcano via WhatsApp, stating that she had sent the contract to "***RE/MAX***" via FedEx and that the builder would countersign. **Exhibit "O."**

159. On October 4, 2022, Nazarov followed up again, stating that she paid ten (10%) percent of the purchase price down and signed the contract a long time ago, but had not received any update on the project. **Exhibit "O."**

160. Throughout 2023, Nazarov made numerous inquiries to Marcano about the project's status, including whether he had visited the site and whether construction was underway. She was repeatedly rebuffed, given assurances that construction would start and that she would be refunded, and urged not to retain counsel.

161. As of February 20, 2023, Nazarov's payments totaled $17,700 USD, and she was sending wire transfers every other month, at month-end.

162. On May 18, 2023, Nazarov emphasized her reliance on Marcano, stating: *"**You are an agent and my representative in the Dominican Republic. I need to rely on your information**, and what you provided so far tells me that the construction company is not showing me any real results."* (emphasis supplied). **Exhibit "O."**

163. Nazarov further explained: *"Another problem that I have is that I don't live in the DR and there is absolutely no control…. **Can you please ask your broker (REMAX) to get involved?** I need answers…"* (emphasis and parenthetical supplied). **Exhibit "O."**

164. On June 1, 2023, Marcano stated: *"The construction company issued the statement, it was precisely what they told me in the office, they are going to change the delivery arrows because the architect of the construction company died and that implied changing all the documentation."* **Exhibit "O."**

165. On December 12, 2023, Del Moya wrote Nazarov on RE/MAX One letterhead indicating ***"(w)e are writing to you as representatives of RE/MAX ONE, a real estate company that has had the privilege of serving as a commercial intermediary in your investment in the "ROMANA VICTORIANA RESIDENCES" project***…(w)e deeply value our relationship with you, so we assure you that we are doing, and will continue to do everything in our power to ensure that the developer takes the necessary actions to resume the proper evolution of the project, and you can see your investment dream come true, in the shortest possible time. ***As a commercial intermediary, we are here to support you in all your needs.***" (emphasis supplied). **Exhibit** "___."

166. On January 12, 2024, Marcano advised: "*My priority is to ensure your money I have invested.*" [sic]. **Exhibit "O."**

167. On January 23, 2024, Nazarov demanded the return of her funds: "*at this point I want the money. I no longer want to continue to do business with them (the construction*

*company)*." (parenthetical supplied). **Exhibit "O."**

168. On February 24, 2024 Nazarov reiterated, "*I need to get my money back. Lawyer never got back to me to let me know about 20%. I need to get my refund…I paid them $27,771.00*." **Exhibit "O."**

169. Marcano then discouraged Nazarov from retaining a lawyer: "*Wait to see if they really give the money and then not have to pay a lawyer who is going to take more money from you*." **Exhibit "O."**

170. On May 7, 2024, Nazarov wrote: "*hope everything is good with you. I wanted to reach out with my thinking about this situation. I was introduced to this property by your real-estate company. You have a broker of your agency that should be fully involved in this mess of a situation. Besides you trying to solve this issue, by law your broker is responsible in getting this case resolved. Your agency was supposed to earn commissions on the sale of this condo. I would have not know about this condo if it wasn't introduced by your first agent Kirby and then you took over….what does your broker has to say about this horrific experience?*" **Exhibit "O."**

171. Marcano replied: "*the broker is in contact with the company, which is Remax one and has the master broker in this case, and have been in contact with them lately. They are more in contact with the construction company and the last thing they told me Yesterday it was that they spoke to him and the construction company informed them that the reimbursement payments were stopped and that they will be resumed shortly that is what they told me yesterday I write every day every day I call I contacted the broker who remax One What is true is that I am doing my best.*" **Exhibit "O."**

172. Marcano further represented, "*I remain in constant communication with Rocío, who is the representative of Remax. The last thing she told me is that the entire (refund) request has*

*been made.*" **Exhibit "O."**

173. In addition to extensive WhatsApp and email communications, Plaintiff Nazarov made efforts to view the purported properties in the Dominican Republic. During visits in November 2023 and again in 2024, both Marcano and De Moya presented her with RE/MAX-branded business cards and escorted her to parcels of vacant land, which they falsely represented as the project site. These interactions further reinforced Plaintiff Nazarov's reasonable belief that the development was legitimate and that she was dealing with authorized representatives of the RE/MAX Syndicate.

174. On July 16, 2024, a project update was circulated on RE/MAX Syndicate's branded letterhead, prominently featuring the trademark balloon logo shown below, and was reportedly distributed to hundreds of United States consumers in connection with these fictitious properties.[17]

175. The July 16, 2024 letter purported to acknowledge communications with the developers while simultaneously denying any responsibility for refunding defrauded purchasers. The letter stated, in part: *"Despite repeated requests, neither RE/MAX One nor the buyers have been waiting a formal update from Novasco SRL to provide buyers with clarity about the status of the project. However, despite repeated requests, neither RE/MAX One nor the buyers have received such a communication… In this context, given the lack of cooperation, there is no doubt that RE/MAX One's name has been harmed by the relationship with Novasco SRL."* The letter's equivocal tone and denial of responsibility served only to obscure RE/MAX's role and perpetuate

[17] **Exhibit "R."**

the harm to affected United States consumers. **Exhibit "R."** Plaintiff Nazarov specifically associated Marcano with the RE/MAX Syndicate and, in reliance upon Defendants' material misrepresentations and omissions concerning Defendants' operations in the Dominican Republic, reasonably believed that Marcano and the other RE/MAX agents involved in the transaction possessed the same training, licensure, fiduciary obligations, and professional accountability as duly licensed real estate agents operating within the United States.

176. Upon information and belief, Defendants had the ability and authority to intervene to assist affected buyers, including Lead Plaintiff Nazarov, but Defendants deliberately chose not to do so in order to avoid reputational harm to the RE/MAX brand.

177. At no time was Lead Plaintiff Nazarov advised of the materially different (or, in fact, nonexistent) legal, regulatory, and training standards applicable to real estate agents operating under the RE/MAX trade name and dress in the Dominican Republic, nor was she informed that such agents were acting in violation of laws governing real estate practices applicable to this District, including but not limited to the Real Estate Full Disclosure Act and the Real Estate Brokers and Salespersons Licensure Act.

178. As a direct and proximate result of Defendants' misrepresentations and concealment of mandatory disclosures, Lead Plaintiff Nazarov was misled into believing that she was dealing with duly licensed and reputable real estate professionals and that she was participating in legitimate real estate transactions.

179. Notwithstanding repeated assurances from its agents that refunds were being pursued, Lead Plaintiff Nazarov never recovered the $27,771.00 she wired in reliance upon the RE/MAX Syndicate's material advertising misrepresentations and omissions. The funds remain unrecovered and constitute a direct financial loss proximately caused by Defendants' deceptive

conduct and knowing facilitation of the fraudulent scheme.

## K. Lead Plaintiff Dahiana Grullon's Allegations

180. Similar to Lead Plaintiff Nazarov, Lead Plaintiff Dahiana Grullon was directed to the RE/MAX Website in or about 2022 while searching for residential properties in or around La Romana, Dominican Republic. Through the RE/MAX website, Lead Plaintiff Grullon was connected to individuals holding themselves out as RE/MAX agents through the RE/MAX Syndicate.

181. Thereafter, Lead Plaintiff Grullon was introduced by Defendants to multiple individuals purporting to act as RE/MAX agents and representatives of the Non-Party Dominican Sellers, including, upon information and belief, Loany Ortiz and Del Moya. These individuals were publicly linked to the RE/MAX website and prominently featured across multiple online platforms as RE/MAX-affiliated agents promoting both of the fictitious development projects at issue in this Action.

182. By way of example, below is a screen capture of Loany Ortiz—one of the involved agents and, upon information and belief, now a fugitive, promoting the La Romana Project through a "RE/MAX One" Instagram account.




183. In addition, agents operating within the RE/MAX Syndicate distributed false and misleading promotional materials to Lead Plaintiff Grullon, including pamphlets through which the Dominican Non-Party Sellers advertised the La Romana property as legitimate, despite lacking valid title or building permits. These materials falsely marketed the property as a "RE/MAX" listing to create an appearance of credibility and induce Lead Plaintiff Grullon to trust the Defendants and purchase what was, in reality, a fictitious property:




184. In addition, agents operating within and presented as part of the RE/MAX Syndicate marketed false and fabricated floor plans to Lead Plaintiff Grullon that prominently displayed the trademarked RE/MAX logo and balloon, for the purpose of creating an illusion of authenticity and credibility, instilling in Lead Plaintiff Grullon a false sense of trust, and inducing her to purchase a fictitious property.



185. In reasonable reliance on the Dominican Sellers and RE/MAX agents representations and on the RE/MAX Syndicate's material advertising misrepresentations and omissions, Plaintiff Grullon wired funds from her United States bank account toward the prospective purchase of real property in the Dominican Republic, believing she was transacting through a legitimate and licensed RE/MAX agent operating under the authority and oversight of the RE/MAX Syndicate.

186. On or about August 2022, individuals whom Grullon understood to be associated with the RE/MAX Syndicate sent her a document titled *"Promise of Purchase Agreement"* for the sale of a one-bedroom, one-bathroom apartment in the Romana Victoriana Residences project, reflecting an agreed purchase price of $43,000.

187. A certified English translation of the August 23, 2022, Spanish-language contract between the builder/developer Novasco Real Estate, S.R.L., a Dominican shell company that the RE/MAX agent brokered the deal through and falsely promoted as legitimate, is attached as **Exhibit "S."**

188. Pursuant to the contract, Grullon was obligated to pay a total purchase price of $43,000 in eleven (11) installments. Based upon the material misrepresentations regarding the Victorian Roman project, Plaintiff Grullon was induced to wire $17,102.00 to entities she believed to be a part of the RE/MAX Syndicate, consisting of the payments set forth in the chart below:[18]

189. On or about July 16, 2024, a project update was circulated on RE/MAX Syndicate's official letterhead, prominently displaying the trademark RE/MAX balloon logo, and advising Lead Plaintiff Grullon that "RE/MAX One is here to support you every step of the way. We will not leave you alone in this process. We are the most well-established real estate company in the

[18] True and correct copies of the wire transfer receipts are attached hereto as **Exhibit "F."**

Dominican Republic, and our top priority is your satisfaction and well-being." Upon information and belief, this correspondence constituted a deceptive communication intended to mislead investors, delay accountability, and obscure responsibility for the fraudulent scheme.

190. Upon information and belief, Defendants had the ability and authority to intervene to assist affected buyers, including Lead Grullon, but Defendants deliberately chose not to do so in order to avoid reputational harm to the RE/MAX brand.

191. Plaintiff Grullon specifically associated the involved RE/MAX agents with the RE/MAX Syndicate and, in reliance upon Defendants' material misrepresentations and omissions concerning Defendants' operations in the Dominican Republic, reasonably believed that the subject RE/MAX agents involved in the transaction possessed the same training, licensure, fiduciary obligations, and professional accountability as duly licensed real estate agents operating within the United States.

192. At no time was Lead Plaintiff Grullon advised of the materially different (or, in fact, nonexistent) legal, regulatory, and training standards applicable to real estate agents operating under the RE/MAX banner in the Dominican Republic, nor was she informed that such agents were acting in violation of laws governing real estate practices applicable to this District, including but not limited to the Real Estate Full Disclosure Act and the Real Estate Brokers and Salespersons Licensure Act.

193. As a direct and proximate result of Defendants' misrepresentations and concealment of mandatory disclosures, Lead Plaintiff Grullon was misled into believing that she was dealing with duly licensed and reputable real estate professionals and that she was participating in legitimate real estate transactions.

194. Notwithstanding repeated assurances from its agents that refunds were being

pursued, Lead Plaintiff Grullon never recovered the $17,102.00 she wired in reliance upon the RE/MAX Syndicate's material advertising misrepresentations and omissions. The funds remain unrecovered and constitute a direct financial loss proximately caused by Defendants' deceptive conduct and knowing facilitation of the fraudulent scheme.

**M. Lead Plaintiffs Sylvana Marmolejos and Francisco Montero's Allegations**

195. Lead Plaintiff Sylvana Marmolejos and Francisco Montero, husband and wife and residents of the State of New Jersey, entered into a contract to purchase real estate in reliance upon the Defendants' solicitations, marketing materials, and repeated representations that they were the ***"#1 Trusted Real Estate Brand***" and that the real estate agents and transactions involved had been vetted and endorsed by the RE/MAX. Syndicate. Relying on these and other material misrepresentations, Ms. Marmolejos and Mr. Montero agreed to purchase property in a development marketed as the Romana Victoriana Residences, purportedly located in the province of La Romana, Dominican Republic. In further reliance on the Defendants' conduct and representations, Ms. Marmolejos wired funds in the amount of $31,627.00 from her New Jersey bank account to individuals and entities she believed were acting with the actual or apparent authority of the Defendants. *See* **Exhibit "E"**.

196. Plaintiff Marmolejos and Montero specifically associated the involved RE/MAX agents with the RE/MAX Syndicate and, in reliance upon Defendants' material misrepresentations and omissions concerning Defendants' operations in the Dominican Republic, reasonably believed that the subject RE/MAX agents involved in the transaction possessed the same training, licensure, fiduciary obligations, and professional accountability as duly licensed real estate agents operating within the United States.

197. At no time was Lead Plaintiff Marmolejos and Montero advised of the materially different (or, in fact, nonexistent) legal, regulatory, and training standards applicable to real estate agents operating under the RE/MAX banner in the Dominican Republic, nor was she informed that such agents were acting in violation of laws governing real estate practices applicable to this District, including but not limited to the Real Estate Full Disclosure Act and the Real Estate Brokers and Salespersons Licensure Act.

198. As a direct and proximate result of Defendants' misrepresentations and concealment of mandatory disclosures, Lead Marmolejos and Montero were misled into believing that they were dealing with duly licensed and reputable real estate professionals and that she was participating in legitimate real estate transactions.

199. Notwithstanding repeated assurances from its agents that refunds were being pursued, Lead Plaintiff Grullon never recovered the $17,102.00 she wired in reliance upon the RE/MAX Syndicate's material advertising misrepresentations and omissions. The funds remain unrecovered and constitute a direct financial loss proximately caused by Defendants' deceptive conduct and knowing facilitation of the fraudulent scheme.

**N. <u>The Fraud, Uncovered By Dominican Authorities' Investigation Is Never Acknowledged by the RE/MAX Syndicate</u>**

200. On or about February 25, 2025, the Dominican Authorities filed criminal charges against several Dominican nationals who marketed themselves as RE/MAX agents operating through the RE/MAX Syndicate, including Del Moya, Marisol Nova Nolasco ("Nolasco"), and Loany Lismeiry Ortiz Nova (collectively, the "Dominican National Criminal Defendants").

201. The prosecution also brought charges against several entities identified as front companies—Novasco Real Estate S.R.L., Rodeca Marketing Group, RR Marketing Group, and

RE/MAX One, a Dominican RE/MAX franchise. The Dominican Republic indictment alleges that the Dominican Non-Party Sellers *"used electronic means to attract victims, obtaining large sums of money in U.S. dollars and Dominican pesos. The organization then disappears and illegally profits from the victims' capital. It strategically uses the multinational RE/MAX to easily attract clients through a manipulative framework."* **Exhibit "A."**

202. The Dominican Authorities further determined that "*De Moya, the master Broker and representative of the company that was in charge of promoting the sale of said projects (RE/MAX ONE), with these fraudulent dealings, via high-tech means, they managed to subtract capital from the victims' assets, affecting years of work and savings in the country and in the US, causing in addition to moral damages, also moral damages of emotional and psychological disturbance, when they are faced with the reality of something that began as a dream and has turned into a nightmare, since they have discovered more than two years later that there is no building on the land where the supposed housing projects would be built, they do not have title deeds to the land, there is no address for the construction company, rather an uncertain destination, they do not return their money, nor any real possibility of compliance of the contract, it is all a deception, since it has been proven that the defendants claimed to have everything ready within a period that has been widely and advantageously exceeded, for the delivery of residential units that have never been carried out.*" **Exhibit "A."**

203. The Dominican Authorities further found that De Moya facilitated the acquisition of the RE/MAX International franchise in the Dominican Republic, "*which was used for said promotion*." A subsequent search revealed that the front companies were using promotional materials displaying the RE/MAX One name, including posters and telephone numbers, and that documents seized contained records of "*administrative expenses and income of RE/MAX One*."

Exhibit **"A."**

204. The Dominican Authorities determined that between the beginning of 2022 and March 2024, that the Dominican National Criminal Defendants used the franchise that De Moya acquired through the RE/MAX Syndicate to deceive United States consumers. **Exhibit "A."**

205. The Dominican Authorities further found that United States consumers "*were contacted by the agents representing the aforementioned real estate agency RE/MAX ONE, who sent them via email and the WhatsApp application…"* **Exhibit "A."**

206. The investigation concluded that *"(w)hen it was time to deliver the projects, members of the structure began to disappear, not answering calls or emails, and not placing a block or cement on the plots where they were supposed to operate."* **Exhibit "A."**

207. The Dominican Authorities further found that "*(w)hen the agents of RE/MAX ONE RD, under the direction of the defendant (Del Moya), began promoting the Victoriana Real Estate Project, the company Novasco Real Estate S.R.L. had only been established for 8 months. Therefore, it was impossible for the company to have developed several real estate projects in such a short time of existence…*" **Exhibit "A."**

**O. <u>Damages Sustained as a Result of Defendants' Conduct</u>**

208. The Dominican Authorities conducted a financial analysis of bank accounts in the name of Novasco Real Estate S.R.L., account number 824933261 and determined that within months of the project's launch, sales agreements had already been executed with approximately two hundred and eighteen (218) buyers, representing roughly eighty percent (80%) of the purported development, who collectively paid deposits, down payments, and installment amounts totaling $4,018,664.99 in United States dollars. Financial records further revealed that Novasco's account, which received approximately $49,000 USD in transfers for the fictitious properties in

2021, ballooned to over $4 million USD in 2022, $10 million USD in 2023, and approximately $4 million United States dollars in 2024 as the scam was being detected reflecting total misappropriated funds exceeding $18,851,583.12. *See* Exhibit "A."

209. The Dominican Authorities document, international transfer from at least four hundred and ninety-three specific (493) United States consumers itemizing them by name of the sender and amount in United States dollars at least $6,597,087.81 over the span of the Class Period directed to account number 824933261, among these being confirmed wire transfers from Lead Plaintiff Nazarov in the amount of $27,771.00 and Lead Plaintiff Dahiana Grullon in the amount of $21,922.00. A complete list of the identified U.S. consumers and their respective transfer amounts is set forth in the attached document. *See* **Exhibit "A."**

210. Despite the public criminal prosecutions, detailed findings, and extensive evidentiary record developed by the Dominican Authorities, the RE/MAX Syndicate have never issued a public acknowledgment, consumer warning, or offer of restitution to the victims of the fraudulent scheme perpetrated through their brand. Nor have they undertaken any meaningful corrective action, disciplinary measures, or compliance audit to identify or remediate their own systemic failures that enabled the fraud. The public representations on the RE/MAX Website remain the same as during the Class Period.

211. Defendants have deliberately chosen to continue conducting and expanding business operations within the Dominican Republic, a jurisdiction that does not regulate or require licensure of real estate agents, while continuing to connect United States consumers with unlicensed RE/MAX-affiliated agents without any disclaimer or warning. In doing so, Defendants have willfully prioritized the protection of the RE/MAX brand image and the preservation of its global revenue streams over transparency, accountability, and restitution to the defrauded

consumers.

212. The RE/MAX Syndicate continues to connect United States consumers with unlicensed real estate agents and to profit from these transactions through their official RE/MAX website and digital referral systems, despite actual knowledge of the fraudulent scheme and the undisputed fact that the Dominican Republic does not require real estate agents to be licensed. By maintaining these operations without disclosure, the RE/MAX Syndicates perpetuate an immediate risk of consumer deception, exposing additional U.S. consumers to the same unlawful practices that defrauded the Lead Plaintiffs. The continuing nature of this conduct presents a substantial and imminent threat of irreparable harm through future violations of consumer protection laws, warranting injunctive relief to prevent further injury and the continued monetization of unregulated, fraudulent real estate activity.

213. Upon information and belief, during the Class Period, more than five hundred (500) United States consumers were induced to transfer and wire funds in reliance upon false and fraudulent statements made by the RE/MAX Syndicate and its agents, purportedly for the purchase of real property in the Dominican Republic that, in reality, did not exist.

214. As a direct and foreseeable result of these misrepresentations, upon information and belief, United States consumers sustained aggregate economic losses exceeding ten million dollars ($10,000,000), exclusive of consequential damages such as interest, transaction fees, and other related financial harm, and exclusive of any treble or punitive damages, the full extent of which will be established at trial and is believed to be in excess of thirty million dollars ($30,000,000).

## V. <u>CLASS ACTION ALLEGATIONS</u>

215. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who wired funds to the Dominican Seller Non-

Parties for the “Romana Victoriana Residences” and the “Bávaro Victoriana Residences” in reliance of material misrepresentations made by Defendants during the Class Period, and who were damaged thereby (the “Class”). Excluded from the class are citizens of the Dominican Republic or foreign nationals abroad that purchased the property.[19]

216. While the exact number of Class Members is unknown at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or potentially thousands of members in the proposed Class, at least four hundred and ninety-three (493) United States consumers of which have been identified by the Dominican Authorities. **Exhibit “A.”** Other members of the Class may be identified from records maintained by Defendants, their agents, or through other discovery.

217. Common questions of law and fact predominate and include:

(a) whether Defendants omitted or misrepresented material facts;

(b) Whether, and which, United States consumers wired funds to RE/MAX agents in reliance upon Defendants’ statements;

(c) Whether Defendants knew, or acted with reckless disregard as to whether, their statements and representations were false;

(d) Whether the RE/MAX agents involved were acting with the actual or apparent authority of the Defendants; and

(e) The nature, extent, and appropriate measure of damages suffered by the Class.

218. Lead Plaintiffs’ claims are typical of the claims of the members of the Class, as all

[19] All rights are reserved to expand this class to include additional individuals who purchased fraudulent land in the Dominican Republic based on Defendants’ false and misleading representations.

members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law and the claims complained of herein.

219. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in connection with this litigation.

220. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some of the individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for Members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J.S.A. 56-8-1 et seq.)
### (Against All Defendants)

221. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

222. Lead plaintiffs and the putative class members are proper persons and consumers as defined by the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. ("Consumer Fraud Act").

223. Defendants are each "persons" within the meaning of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2, which expressly includes artificial entities as well as the owners, directors, and officers of businesses entities.

224. The Consumer Fraud Act applies to the sale or advertisement of real estate. N.J.S. 56:8-2.

225. The Consumer Fraud Act is designed to protect consumers from fraudulent and deceptive sales practices in connection with the marketing and sale of real estate, including “sharp practices and dealings” that lure consumers into transactions through false or misleading representations.

226. Under N.J.S.A. 56:8-2, an unlawful practice includes any unconscionable or abusive commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of a material fact upon which others rely.

227. New Jersey courts recognize three general categories of unlawful practices under the Act: (i) affirmative acts, (ii) knowing omissions, and (iii) regulatory violations. These categories are not mutually exclusive.

228. Affirmative acts prohibited under N.J.S.A. 56:8-2 include unconscionable or abusive commercial practices, deception, fraud, false pretenses, false promises, and misrepresentations.

229. A person’s failure to comply with disclosure or regulatory requirements imposed by other statutes constitutes an unconscionable commercial practice under the Consumer Fraud Act.

230. Pursuant to the New Jersey Real Estate Full Disclosure Act, no out-of-state or foreign property may be advertised or offered to New Jersey residents unless the project is first registered with the New Jersey Real Estate Commission.

231. The New Jersey Real Estate License Act prohibits any person from engaging in real-estate brokerage activities for compensation without holding a valid real-estate license. Its

central purpose is to protect consumers by excluding unqualified, unscrupulous, or dishonest actors from the real-estate market.

232. Defendants' conduct violated the New Jersey Consumer Fraud Act, the New Jersey Real Estate Full Disclosure Act, and the New Jersey Real Estate License Act. Defendants' misrepresentations and omissions regarding the licensure, authority, and oversight of individuals portrayed as RE/MAX agents operating in the Dominican Republic constituted a systematic pattern of deception and unconscionable commercial practices. Such conduct unlawfully induced Plaintiffs and similarly situated consumers to participate in fraudulent real-estate transactions and constitutes unlawful practices within the meaning of the Consumer Fraud Act.

233. Defendants engaged in a systematic course of deception, unlawful and unconscionable commercial practices by knowingly concealing that individuals portrayed as "RE/MAX agents" in the Dominican Republic were unlicensed and unregulated. Through these material misrepresentations and omissions, Defendants misled Plaintiffs and similarly situated consumers into entering fraudulent real-estate transactions in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.*, as well as the New Jersey Real Estate Full Disclosure Act, the Real Estate License Act, and comparable consumer-protection statutes. Defendants falsely represented that Dominican agents possessed equivalent licensure and oversight as U.S. agents; facilitated connections with unlicensed sellers for profit; failed to provide clear disclaimers regarding licensure; concealed that the advertised properties were not registered under New Jersey law; misrepresented the training and supervision of foreign affiliates; and deceptively marketed unlicensed sellers as "trusted" professionals to induce reliance and financial loss.

234. The foregoing misrepresentations and omissions were made notwithstanding Defendants' longstanding awareness that their international operations were subject to disparate

and inconsistent regulatory regimes. As reflected in RE/MAX Syndicate's annual reports issued prior to the Class Period, Defendants expressly acknowledged that "regulatory constraints and costs of executing our growth strategy may vary by geography." *See* **Exhibit "M."**

235. Despite this express recognition, Defendants failed to disclose to United States consumers that these regulatory disparities materially affected the licensing, oversight, and accountability of RE/MAX-affiliated agents operating in the Dominican Republic, thereby perpetuating a deceptive and misleading uniform brand image to induce cross-border real-estate transactions.

236. Defendants' misrepresentations, omissions, and regulatory violations were material and directly induced Lead Plaintiffs and the putative Class Members to engage in the subject transactions.

237. In reasonable reliance on the Dominican Sellers and RE/MAX agents representations and on the RE/MAX Syndicate's material advertising misrepresentations and omissions, Lead Plaintiffs and the putative class members wired funds toward the prospective purchase of real property in the Dominican Republic, believing they were transacting through a legitimate and licensed RE/MAX agent operating under the authority and oversight of the RE/MAX Syndicate.

238. In reasonable reliance on the representations and omissions of the RE/MAX Syndicate and its affiliated agents, Lead Plaintiffs and Class Members wired substantial funds for the purported purchase of real property in the Dominican Republic, believing they were dealing with duly licensed and reputable real-estate professionals acting under the supervision and authority of the Defendants.

239. The aggregate damages sustained by Plaintiffs and the Class are believed to exceed

ten million dollars ($10,000,000), exclusive of interest, attorneys' fees, and the mandatory treble damages recoverable under the New Jersey Consumer Fraud Act.

240. Pursuant to N.J.S.A. 56:8-19, Plaintiffs and the putative Class Members are entitled to recover threefold (treble) the amount of their actual damages, together with reasonable attorneys' fees, costs of suit, and pre- and post-judgment interest, as well as any other relief the Court deems just and appropriate.

**SECOND CLAIM FOR RELIEF**
**RACKETEERING (18 U.S.C. § 1962(c))**
**(Against All Defendants)**

241. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

242. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

243. Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

244. ***The Enterprise***: The RE/MAX Syndicate, together with the Defendant Officers and Directors, the Non-Party Dominican Sellers, its affiliated Dominican franchises, unlicensed agents, and related shell entities including Novasco Real Estate S.R.L., Rodeca Marketing Group, and RR Marketing Group, constitute an association-in-fact enterprise (the "RE/MAX Enterprise"). within the meaning of 18 U.S.C. § 1961(4).

245. The common purpose of the RE/MAX Enterprise was to induce United States consumers to purchase purported real-estate properties in the Dominican Republic and to generate profits through the exploitation of the RE/MAX brand, platform, and global corporate structure. The members of the RE/MAX Enterprise acted in concert to misrepresent the legitimacy of the developments, to conceal the absence of licensing and regulatory compliance, and to use the RE/MAX name and digital infrastructure as the vehicle through which the fraudulent scheme was executed and sustained.

246. The RE/MAX Enterprise maintained an ongoing organizational structure and defined relationships among its members, who coordinated their roles and shared objectives directed toward soliciting and exploiting United States consumers in relation to online property sales under the RE/MAX brand.

247. The RE/MAX Enterprise existed throughout the Class Period and, upon information and belief, continues to operate. It has maintained a consistent framework, shared purpose, and coordinated operations among its participants, functioning as a continuing association-in-fact through which the RE/MAX Syndicate, its affiliates, and related foreign entities solicit, market, and profit from cross-border real-estate transactions under a false appearance of legitimacy and brand oversight.

248. The Defendant Officers and Directors were each associated with and participated in the affairs of the RE/MAX Enterprise within the meaning of 18 U.S.C. § 1962(c), serving as senior executives, directors, and/or controlling persons who directed, approved, or knowingly permitted the acts alleged herein.

249. The Enterprise could not accomplish its purpose without the coordinated activity of its members.

250. ***Pattern of Racketeering Activity***: Over the course of the Class Period, the RE/MAX Syndicate has been engaged in activities that affect interstate and foreign commerce. Defendants each conducted or participated, directly or indirectly, in the conduct of the affairs of the RE/MAX Enterprise through a pattern of racketing activity, within the meaning of 18 U.S.C. §§ 1962(5) and 1962(c), consisting of instances of mail fraud in violation of 18 U.S.C. § 1341, and wire fraud, in violation of § 1343. The RE/MAX Enterprise has been continuous, longstanding, and open ended. It continues to the present day.

251. The Defendants, and each of them, individually and as part of the RE/MAX Enterprise, devised the scheme in order to obtain profits and expand brand recognition by means of false or fraudulent pretenses, representations, and omissions. Each Defendants' participation was crucial to the racketeering activity.

252. The pattern of racketeering activity included numerous predicate acts of mail fraud and wire fraud, including, but not limited to, the following: knowingly concealing that individuals presented as "RE/MAX agents" in the Dominican Republic were unlicensed, unregulated actors operating outside any legitimate oversight. Through this pattern of material misrepresentations and omissions, Defendants induced Plaintiffs and similarly situated consumers to participate in fraudulent real-estate transactions, thereby conducting and participating in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), as well as the New Jersey Consumer Fraud Act, the Real Estate Full Disclosure Act, the Real Estate License Act, and analogous statutes. Defendants falsely represented licensure and regulatory parity with U.S. agents, facilitated connections with unlicensed sellers for profit, omitted any disclaimer of the agents' unlicensed status, concealed that the advertised properties were not lawfully registered for sale to New Jersey residents, misrepresented the training and supervision of foreign affiliates,

and deceptively portrayed unlicensed sellers as "trusted" professionals to induce reliance and extract money from victims across state lines.

253. In furtherance of this pattern of racketeering, the Defendants and their co-conspirators, through the RE/MAX Enterprise among other things:

(a) Coordinated the use of RE/MAX's corporate resources, marketing platforms, and digital systems to promote fraudulent listings and fictitious developments;

(b) Enabled and encouraged the continued use of RE/MAX's trademarks, websites, and communication channels by unlicensed foreign sellers and shell entities to reach and defraud U.S. consumers;

(c) Disseminated false and misleading information through electronic communications, including emails, websites, and social-media advertising;

(d) Concealed material facts regarding the absence of licensing, registration, and regulatory oversight applicable to the Dominican Republic agents and properties; and

(e) Shared profits and proceeds derived from the fraudulent transactions, thereby reinforcing and perpetuating the scheme.

254. The aforementioned racketeering activity was intended to and did further a scheme to defraud and obtain money by means of false and fraudulent pretenses, wherein the RE/MAX Enterprise caused electronic communications consisting of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of § 1343.

255. The conduct of Defendants' scheme was continuous, escalating and of substantial duration and would have continued had it not been discovered and interrupted. Defendants' scheme had no finite end and targeted multiple victims. Each Defendant's last racketeering activity

occurred after the effective date of 18 U.S.C. § 1961, et seq., and each Defendant's last racketeering act occurred within ten (10) years after the commission of a prior act of racketeering activity.

256. As a direct and proximate result of Defendants' racketeering scheme, Lead Plaintiffs and the putative Class Members suffered substantial financial losses, including the loss of principal investment funds and related consequential damages.

257. The aggregate damages sustained by Plaintiffs and the Class are believed to exceed ten million dollars ($10,000,000), exclusive of interest, attorneys' fees, and treble damages recoverable.

258. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the putative class members are entitled to recover treble its compensatory damages, plus interest, costs and attorneys' fees.

**THIRD CLAIM FOR RELIEF**
**RACKETEERING CONSPIRACY (18 U.S.C. § 1962(d))**
**(Against All Defendants)**

259. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

260. Section 1962(d) of RICO makes it unlawful for "any person to conspire to violate any of the provisions of 18 U.S.C. 1964(c).

261. During the Class Period, Defendants violated the provisions of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). Specifically, Defendants knowingly and willfully agreed that they and others would participate in and conduct the affairs of the RE/MAX Enterprise through a pattern of racketeering activity. In furtherance of this agreement, Defendants conspired to use the RE/MAX brand, platform, and digital infrastructure to perpetrate a fraudulent scheme

targeting United States consumers and to derive profits from the marketing and sale of misleading, unregistered, fictitious, or unregulated real-estate projects in the Dominican Republic as detailed above.

262. Each Defendant knew that the acts alleged in the preceding count constituted or would constitute a pattern of racketeering activity, and each agreed that one or more conspirators would commit at least two predicate acts of racketeering (including mail fraud and wire fraud) in furtherance of the Enterprise's objectives.

263. In furtherance of this conspiracy, the Defendants and their co-conspirators, through the RE/MAX Enterprise among other things:

(a) Coordinated the use of RE/MAX's corporate resources, marketing platforms, and digital systems to promote fraudulent listings and fictitious developments;

(b) Enabled and encouraged the continued use of RE/MAX's trademarks, websites, and communication channels by unlicensed foreign sellers and shell entities to reach and defraud U.S. consumers;

(c) Disseminated false and misleading information through electronic communications, including emails, websites, and social-media advertising;

(d) Concealed material facts regarding the absence of licensing, registration, and regulatory oversight applicable to the Dominican Republic agents and properties; and

(e) Shared profits and proceeds derived from the fraudulent transactions, thereby reinforcing and perpetuating the scheme.

264. Defendants and their co-conspirators adopted roles consistent with, and performed acts in furtherance of, the conspiracy, each knowing of its general scope and nature and intending to further its fraudulent objectives.

265. As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. § 1962(c), Lead Plaintiffs and the putative Class Members suffered substantial financial losses, including the loss of principal investment funds and related consequential damages.

266. The aggregate damages sustained by Plaintiffs and the Class are believed to exceed ten million dollars ($10,000,000), exclusive of interest, attorneys' fees, and treble damages recoverable.

267. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the putative Class Members are entitled to recover threefold (treble) their actual damages, together with interest, costs of suit, and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF
**RACKETEERING (N.J. § 2C:41-2(c))**
**(Against All Defendants)**

268. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

269. Plaintiffs, are, and at all times relevant have been "persons" within the meaning of N.J. Stat. §§ 2C:41-1(b) and 2C:41-4(c).

270. Each of the Defendants is, and at all relevant times has been, a person within the meaning of N.J. Stat. §§ 2C:41-1(b) and 2C:41-2(c).

271. Defendants were at all relevant times The RE/MAX Syndicate, together with the Defendant Officers, its affiliated Dominican franchises, unlicensed agents, and related shell entities including Novasco Real Estate S.R.L., Rodeca Marketing Group, and RR Marketing Group (the "RE/MAX Enterprise"), constitute an association-in-fact enterprise within the meaning of N.J. Stat § 2C:41-1(c).

272. ***The Enterprise***: The RE/MAX Syndicate, together with the Defendant Officers and Directors, the Non-Party Dominican Sellers, its affiliated Dominican franchises, unlicensed agents, and related shell entities including Novasco Real Estate S.R.L., Rodeca Marketing Group, and RR Marketing Group, constitute an association-in-fact enterprise (the "RE/MAX Enterprise"). within the meaning of 18 U.S.C. § 1961(4).

273. The common purpose of the RE/MAX Enterprise was to induce United States consumers to purchase purported real-estate properties in the Dominican Republic and to generate profits through the exploitation of the RE/MAX brand, platform, and global corporate structure. The members of the RE/MAX Enterprise acted in concert to misrepresent the legitimacy of the developments, to conceal the absence of licensing and regulatory compliance, and to use the RE/MAX name and digital infrastructure as the vehicle through which the fraudulent scheme was executed and sustained.

274. The RE/MAX Enterprise maintained an ongoing organizational structure and defined relationships among its members, who coordinated their roles and shared objectives directed toward soliciting and exploiting United States consumers in relation to online property sales under the RE/MAX brand.

275. The RE/MAX Enterprise existed throughout the Class Period and, upon information and belief, continues to operate. It has maintained a consistent framework, shared

purpose, and coordinated operations among its participants, functioning as a continuing association-in-fact through which the RE/MAX Syndicate, its affiliates, and related foreign entities solicit, market, and profit from cross-border real-estate transactions under a false appearance of legitimacy and brand oversight.

276. The Defendant Officers and Directors were each associated with and participated in the affairs of the RE/MAX Enterprise within the meaning of 18 U.S.C. § 1962(c), serving as senior executives, directors, and/or controlling persons who directed, approved, or knowingly permitted the acts alleged herein.

277. The Enterprise could not accomplish its purpose without the coordinated activity of its members.

278. Defendants each conducted or participated, directly or indirectly, in the conduct of the affairs of the RE/MAX Enterprise through a pattern of racketing activity, within the meaning of 18 U.S.C. §§ 1962(5) and 1962(c), consisting of instances of mail fraud in violation of 18 U.S.C. § 1341, and wire fraud, in violation of § 1343. These federal fraud violations constituted racketeering activity under N.J.S.A. § 2C:41-1(a)(2).

279. The aforementioned racketeering activity was intended to and did further a scheme to defraud and obtain money by means of false and fraudulent pretenses.

280. The conduct of Defendants' scheme was continuous, escalating and of substantial duration and would have continued had it not been discovered and interrupted. Defendants' scheme had no finite end and targeted multiple victims. Each Defendant's last racketeering activity occurred after the effective date of 18 U.S.C. § 1961, et seq., and each Defendant's last racketeering act occurred within ten (10) years after the commission of a prior act of racketeering activity.

281. As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. § 1962(c), Lead Plaintiffs and the putative Class Members suffered substantial financial losses, including the loss of principal investment funds and related consequential damages.

282. The aggregate damages sustained by Plaintiffs and the Class are believed to exceed ten million dollars ($10,000,000), exclusive of interest, attorneys' fees, and treble damages recoverable.

283. Pursuant to N.J. Stat § 2C:41-4(c), Plaintiffs are entitled to recover treble its compensatory damages, plus interest, costs, and attorneys' fees.

## FIFTH CLAIM FOR RELIEF
## RACKETEERING CONSPIRACY (N.J. § 2C:41-2(d))
## (Against All Defendants)

284. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

285. During the Class Period, Defendants knowingly and willfully conspired to violate the provisions of the New Jersey Racketeer Influenced and Corrupt Organizations Act (the "New Jersey RICO Act"), N.J.S.A. 2C:41-1 et seq., specifically by agreeing to conduct or participate, directly or indirectly, in the conduct of the affairs of the RE/MAX Enterprise through a pattern of racketeering activity as defined under N.J.S.A. 2C:41-1(a).

286. The predicate acts comprising this pattern of racketeering activity included multiple instances of mail fraud, wire fraud, and related financial fraud, in violation of 18 U.S.C. §§ 1341 and 1343, which constitute "racketeering activity" within the meaning of N.J.S.A. 2C:41-1(a)(2) and as fully set forth herein.

287. The aggregate damages sustained by Plaintiffs and the Class are believed to exceed ten million dollars ($10,000,000), exclusive of interest, attorneys' fees, and the mandatory treble damages recoverable under New Jersey law.

288. Pursuant to N.J.S.A. 2C:41-4(c), Plaintiffs and the putative Class Members are entitled to recover threefold (treble) the amount of their actual damages, together with reasonable attorneys' fees, costs of suit, and pre- and post-judgment interest, as well as any other relief the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
**FRAUD (Including Aiding & Abetting Fraud and Conspiracy to Commit Fraud)**
**(Against All Defendants)**

289. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

290. Defendants knowingly and intentionally made, or caused to be made, false and misleading statements of material fact, and concealed or omitted material information, regarding the nature, licensure, authority, and oversight of individuals represented as RE/MAX agents operating in the Dominican Republic, as well as the legitimacy of the purported real-estate projects marketed to U.S. consumers.

291. Defendants knew that these representations were false and intended that Plaintiffs and the putative Class Members would rely upon them in deciding to wire funds and enter into purported real-estate transactions.

292. Defendants further knew and intended that the false representations and omissions they made, or caused to be made through their agents, affiliates, and digital platforms, would

induce consumers to transfer money for unregistered, fictitious, or unregulated real-estate developments.

293. Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together—and with others—to defraud Plaintiffs and the Class. Each Defendant adopted and pursued the common objective of furthering and facilitating the fraudulent scheme.

294. In furtherance of this conspiracy, Defendants committed, or caused to be committed, a series of overt acts, including but not limited to:

(a) Disseminating false and misleading advertisements and communications through RE/MAX's global digital platforms and affiliated franchise networks;

(b) Permitting unlicensed sellers to hold themselves out as RE/MAX "agents" or "brokers";

(c) Concealing the absence of required registration and licensure for the properties and agents involved; and

(d) Accepting and retaining profits, commissions, or other benefits derived from consumer transactions procured through the fraudulent scheme.

295. Plaintiffs and the putative class members justifiably relied on Defendants' misrepresentations and were unaware of Defendants' fraud.

296. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and the putative Class Members suffered substantial damages, including the loss of principal investment funds, consequential damages, and other financial harm, in an amount to be determined at trial but believed to exceed ten million dollars ($10,000,000).

## SEVENTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against All Defendants)**

297. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

298. As a result of their fraudulent and deceptive conduct, Defendants wrongfully obtained and retained monetary benefits, including profits, commissions, fees, and other financial gains derived from transactions induced by false representations and omissions.

299. Defendants were unjustly enriched at the expense of Plaintiffs and the putative Class Members, who transferred substantial funds based on misrepresentations concerning the authenticity, registration, and licensure of the real-estate projects and agents involved.

300. Each Defendant benefitted from the proceeds of the fraudulent scheme and has no lawful right to retain those gains.

301. Equity and good conscience require restitution and disgorgement of all amounts by which Defendants have been unjustly enriched.

302. If Defendants are permitted to retain the benefits obtained through their wrongful conduct, it would result in unjust enrichment and be contrary to principles of equity.

## EIGHTH CLAIM FOR RELIEF
**Negligent Misrepresentation and Negligence by Apparent Authority**
**(Against All Defendants)**

303. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

304. Defendants, directly and through their agents and apparent agents, made false statements of material fact and omitted material information regarding the authenticity, licensure, and oversight of RE/MAX-affiliated agents and the legitimacy of the purported Dominican Republic real-estate developments.

305. Defendants owed Plaintiffs and the putative Class Members a duty to exercise reasonable care in verifying the truth and completeness of statements made through RE/MAX's marketing materials, websites, digital platforms, and communications, as well as care in supervising those held out to the public as RE/MAX agents or representatives.

306. Defendants breached those duties by failing to exercise reasonable care in supervising, monitoring, and controlling their apparent agents and by allowing unlicensed, unregulated individuals to represent themselves as RE/MAX agents under the color of brand authority.

307. Defendants also failed to issue any corrective statements, warnings, or disclaimers once they knew, or should have known, that false or misleading representations were being made to consumers.

308. Defendants are liable for the negligent acts and omissions of their apparent agents under the doctrine of negligence by apparent authority, because Defendants (i) held out such agents as their authorized representatives, (ii) knew or should have known that consumers would rely on such representations, and (iii) failed to supervise or control those agents' conduct with reasonable care.

309. Plaintiffs and the putative Class Members reasonably relied on the accuracy of Defendants' representations and the apparent authority of the purported RE/MAX agents and were unaware of the falsity of those statements.

310. As a direct and proximate result of Defendants' negligent misrepresentations and their breach of duties arising from apparent authority, Plaintiffs and the putative Class Members suffered damages, including the loss of investment funds and related financial harm, in an amount to be determined at trial but believed to exceed ten million dollars ($10,000,000).

**NINTH CLAIM FOR RELIEF**

Declaratory Judgment (28 U.S.C. §§ 28 U.S.C. §§ 2201-2202)
(Against All Defendants)

311. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

312. An actual, present, and continuing controversy exists between Plaintiffs and Defendants within the meaning of 28 U.S.C. § 2201, because Defendants maintain and operate interactive websites, online platforms, and digital marketing channels that continue to display, promote, and facilitate listings for purported Dominican Republic real-estate developments and to represent that such properties and "RE/MAX agents" are legitimate, licensed, and trustworthy.

313. As a result, Plaintiffs, the putative Class, and the public remain subject to ongoing risk of deception and financial harm. Defendants' continuing conduct creates an immediate and justiciable controversy regarding the legality of their representations and ongoing business practices.

314. Plaintiffs contend that Defendants' continuing conduct violates the New Jersey Consumer Fraud Act, the federal and state RICO statutes, and common-law duties prohibiting fraud, negligent misrepresentation, and unjust enrichment.

315. Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a judicial declaration that:

(a) Defendants' ongoing operation of websites and digital platforms that misrepresent the licensing, regulation, and legitimacy of foreign RE/MAX affiliates constitutes unlawful, deceptive, and unconscionable conduct;

(b) Defendants' failure to remove or correct misleading online content constitutes a continuing violation of the Consumer Fraud Act and related statutes;

(c) Defendants have a present and continuing duty to disclose clearly and conspicuously the licensing and regulatory status of all RE/MAX agents and listings accessible to U.S. consumers in the Dominican Republic or to put a disclaimer; and

(d) Defendants must take affirmative steps to correct past misrepresentations and prevent further consumer deception.

316. Pursuant to 28 U.S.C. § 2202, Plaintiffs further seek all necessary or proper supplementary relief to effectuate the declarations requested herein, including equitable, monetary, and class-wide remedies, together with reasonable attorneys' fees, costs, and such other relief as the Court deems just and proper.

## **TENTH CLAIM FOR RELIEF**

Injunctive Relief (Temporary Restraining Order and Preliminary Injunction – Fed. R. Civ. P. 65)
(Against All Defendants)

317. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this complaint.

318. Defendants' continuing operation of websites, online platforms, and marketing systems that promote, display, and facilitate unlicensed, unregistered, and fictitious real-estate

projects in the Dominican Republic constitutes an ongoing and imminent violation of federal and state law, including the New Jersey Consumer Fraud Act prohibiting fraud and misrepresentation.

319. These ongoing misrepresentations pose a continuing and immediate risk of irreparable harm to Plaintiffs, the putative Class, and the public at large by inducing additional consumers to transfer funds or engage in cross-border real-estate transactions under false pretenses in violation of the New Jersey Consumer Fraud Act.

320. Plaintiffs therefore seek emergent injunctive relief**,** including issuance of a Temporary Restraining Order ("TRO") and Preliminary Injunction under Fed. R. Civ. P. 65**,** directing that:

(a) Defendants immediately disable, remove, or suspend all website content, online listings, and marketing materials accessible to U.S. consumers that promote or facilitate the sale of unlicensed, unregistered, or fictitious real-estate developments in the Dominican Republic;

(b) Defendants cease representing, implying, or suggesting that RE/MAX-affiliated agents operating outside the United States possess equivalent licensure, regulatory oversight, or accountability as U.S.-based RE/MAX agents;

(c) Defendants issue corrective disclosures, prominently displayed on all websites and digital marketing platforms, advising consumers that Dominican Republic agents are not licensed or regulated by any U.S. or New Jersey authority;

(d) Defendants preserve and produce all communications, marketing materials, listings, transaction records, and consumer correspondence related to the Dominican Republic developments; and

(e) Defendants implement and certify to the Court a compliance and monitoring program designed to prevent recurrence of the unlawful conduct described herein.

321. Plaintiffs further request that, following hearing, the Court convert the Temporary Restraining Order into a Preliminary and Permanent Injunction, enjoining Defendants, their officers, agents, employees, affiliates, successors, and assigns from continuing or resuming the deceptive and unlawful practices alleged.

322. Plaintiffs and the putative Class are likely to succeed on the merits of their claims, have no adequate remedy at law, and face irreparable injury absent immediate injunctive relief. The balance of equities and the public interest both strongly favor issuance of the requested injunction.

323. Accordingly, pursuant to the equitable powers of this Court and Fed. R. Civ. P. 65, Plaintiffs respectfully request that the Court issue emergent injunctive relief in the form of a Temporary Restraining Order, followed by a Preliminary and Permanent Injunction, together with such other equitable and ancillary relief as the Court deems just and proper.

## I. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that judgment be entered in their favor and against all Defendants, jointly and severally, and that the Court grant the following relief:

a. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; designate the Lead Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel;

b. Declare, pursuant to 28 U.S.C. §§ 2201–2202, that Defendants' conduct constitutes unlawful, deceptive, and unconscionable business practices in violation of federal and state law;

c. Declare that Defendants' ongoing operation of websites, platforms, and marketing systems that promote unlicensed, unregistered, and fictitious real-estate developments constitutes continuing violations of the New Jersey Consumer Fraud Act, federal and state RICO statutes, and applicable common law;

d. Issue emergent injunctive relief pursuant to Fed. R. Civ. P. 65, including a Temporary Restraining Order and Preliminary Injunction, directing Defendants to immediately: (i) Remove, disable, or suspend all online listings, advertisements, or communications accessible to U.S. consumers that promote unlicensed, unregistered, or fictitious real-estate projects in the Dominican Republic; (ii) Cease and desist from making or disseminating any representation that Dominican Republic RE/MAX agents are duly licensed, regulated, or supervised to U.S. standards; (iii) Publish corrective statements on their websites and digital platforms clarifying the unlicensed and unregulated status of foreign RE/MAX affiliates; (iv) Preserve and produce all documents, communications, and electronic data concerning Dominican Republic listings, consumers, and affiliated sellers; (iv) Implement a compliance and monitoring program, subject to Court oversight, designed to prevent recurrence of the unlawful conduct alleged herein; and (v) and retain continuing jurisdiction over this action to ensure compliance with the Court's orders, monitor Defendants' remedial actions, and enforce any equitable or monetary judgments

e. Award direct compensatory damages to Plaintiffs and the Class in an amount to be determined at trial, but believed to exceed ten million dollars ($10,000,000);

f. Award interest, transaction fees, and other related financial harm, and any treble or punitive damages, which is demanded to be in excess of thirty million dollars ($30,000,000).

g. Award treble damages as authorized by: (i) The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-19; (ii) The federal RICO statute, 18 U.S.C. § 1964(c); and (iii) The New Jersey RICO statute, N.J.S.A. 2C:41-4(c);

h. Order restitution, disgorgement, and an accounting of all funds, commissions, profits, and other benefits wrongfully obtained by Defendants through the acts and omissions alleged;

i. Impose a constructive trust upon all such funds and direct that they be equitably distributed to Plaintiffs and the Class.

j. Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P, 38, Lead Plaintiffs hereby demands a trial by jury on all claims asserted in its complaint.

## CERTIFICATION OF NON-ARBITRABILITY AND NON-MEDIATION

In accordance with L. Civ. R. 201.1(d)(1), I certify that the within matter is not subject to compulsory arbitration or to mediation because this action does not consist only of money damages not in excess of $150,000, exclusive of interest and costs and any claim for punitive damages.

**CERTIFICATION OF MAILING TO ATTORNEY GENERAL**

I certify that, contemporaneous with the filing of the above Complaint, a copy of the Complaint was mailed to the New Jersey Attorney General's Office in accordance with N.J.S.A. 56:8-20.

Dated: November 18, 2025

Respectfully submitted,

**YOOK DIPISA LLC**

/s/ ***Joseph A. DiPisa***
Joseph A. DiPisa III, Esq.
2143 Route 4 East
2nd Floor
Fort Lee, New Jersey 07024
Tel: (201) 655-9428
joe@yookdipisa.com

*Attorneys for Plaintiffs*

**VERIFICATION**

I, Lilia Nazarov, declare under penalty of perjury that I am a Lead Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The allegations therein that are based upon my personal knowledge are true, and the allegations as to all other matters are, to the best of my knowledge and belief, true.

I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:
EC797EF9C73C4EF...

11/17/2025

____________________________ November ___, 2025

By: Lilia Nazarov

**VERIFICATION**

I, Dahiana Grullon, declare under penalty of perjury that I am a Lead Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The allegations therein that are based upon my personal knowledge are true, and the allegations as to all other matters are, to the best of my knowledge and belief, true.

I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

69B65571B70341C...

11/17/2025

November ___, 2025

By: Dahiana Grullon

## VERIFICATION

I, Sylvana Marmolejos, declare under penalty of perjury that I am a Lead Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The allegations therein that are based upon my personal knowledge are true, and the allegations as to all other matters are, to the best of my knowledge and belief, true.

I declare under penalty of perjury that the foregoing is true and correct.

Signed by:
Sylvana Antonella Marmolejos Arroyc
5ED1125C8473470...

11/17/2025

________ November ___, 2025

By: Sylvana Marmolejos

# VERIFICATION

I, Francisco Montero, declare under penalty of perjury that I am a Lead Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The allegations therein that are based upon my personal knowledge are true, and the allegations as to all other matters are, to the best of my knowledge and belief, true.

I declare under penalty of perjury that the foregoing is true and correct.

Signed by:
60257FEC4117480...

______________________________
Francisco Montero

11/18/2025
November ___, 2025